"The jurors for the State, upon their oath, present that Zachariah Candler and Elias Jones, both of the county of Buncombe, being evil disposed persons, and designing feloniously to cheat and defraud some *Page 218 
person to the jurors unknown, on the 1st day of April, in the year of our Lord 1823, with force and arms, in the county of Buncombe aforesaid, feloniously did falsely make, forge, and counterfeit, and cause and procure to be falsely made, forged, and counterfeited, and willingly aid and assist in the false making, forging, and counterfeiting a certain note commonly called a bank note, which said false, forged, and counterfeited bank note is as follows, that is to say: [Here follows a copy of the note, purporting to be a note of the Farmers Bank of Virginia for $10], with intention to defraud some person to the jurors unknown, contrary to the statute in that case made and provided, and against the peace and dignity of the State."
The second count was similar to the first, except that it charged an intention to defraud the president, directors, and company of the Farmers Bank of Virginia.
On the trial, before Badger, J., at BUNCOMBE, it was proved on the part of the State that the note in question was found in defendant's possession, together with paper and other materials suitable for the fabrication of bank notes.
The State then called on a witness Smith to prove the note a forgery. He swore that for ten years he had been acting as a merchant in the town of Asheville; that during that period, and particularly during the first six years of it, he had received and passed away a large number of bills of the Farmers Bank of Virginia, as well as on the other (394) banks of that State and this; that during that time more than $5,000 in bills on the Virginia banks had passed through his hands, but the particular proportion of the Farmers Bank he could not ascertain; it had, however, been considerable, and the greater part of the notes had been received and passed by him as genuine more than four years ago, and not one had ever been returned as counterfeit; that he had been an attentive observer of bank notes in general, and especially those of the Farmers Bank; that he had never, to his knowledge, been imposed on by a counterfeit; that he considered himself a competent judge of the notes of the bank in question, and if the notes which he had received and passed were genuine this note was counterfeit. This evidence was objected to, but the court received it.
Garth, an accomplice in the felony, was then called to the prove the fact of forgery. He was objected to on the ground that he had been convicted of forgery in the State of Tennessee; and in support of the objection a duly authenticated transcript of a record from Tennessee was produced, showing that one Barkley had been indicted, tried, convicted, and received sentence for forgery. The identity of Garth, the witness, and Barkley, the convict, was fully proved; and it was also shown that Garth had actually been whipped, placed in the pillory, and *Page 219 
suffered the other punishment directed in the judgment. The court held that the objection went to the credit of Garth, and not to his competency, and he was sworn.
The defendant was found guilty. The admission of the testimony of Smith and Garth formed the ground of a motion for a new trial, which, having been refused, defendant appealed.
That rule of common law which renders a person incompetent (397) to give evidence in a court of justice who has been convicted of an infamous offense is not the consequence of an artificial system, or a state of society peculiar to certain communities, but is founded in the constitution and nature of human associations generally, and is dictated by the necessity, universally felt, of maintaining the purity of the institutions through which justice is administered. A man who stands convicted of falsehood by a tribunal having competent jurisdiction of the offense is deprived of the common presumption, raised by law in favor of witnesses, that they will tell the truth; he can no longer be confided in when he deposes to facts and circumstances affecting the rights of others, and therefore the law, that the stream of justice may not be polluted, will not suffer such a witness to be heard. The objection attaches to his state or condition, which, whenever it is necessary to be considered in relation to its influence on the security of others, may be taken with propriety, if no technical rules interpose to prevent it; for the subject itself is of a moral nature, independent of the conventions of men; and as truth and justice are not confined by geographical limits, but are coextensive with the concerns and relations of civilized communities, the crime which, in reason, renders a witness incompetent in one country must do so in all. The principle of the exclusion is universal, and ought to be binding everywhere, though it may have peculiar modifications stamped upon it, according to the usages and manners of different nations. In some shape or other witnesses have been deemed incompetent on a conviction of certain crimes in every civilized state, a coincidence of sentiment and practice which can only be ascribed to a correct influence from a principle of natural justice. In the civil law a great degree of strictness prevailed with respect to the competency of witnesses. Its rules excluded many persons for objections which, in our law, are confined to the credibility. They rejected not only all persons who were rendered infamous by any condemnation, but (398) also those in whom there was a suspicion of the state of good fame, by order for his apprehension. They would not even allow fathers, mothers, or children to give evidence against each other. 1 Pothier, 519. *Page 220 
They even rejected persons of particular occupations and whole tribes of people. Calvinus; 1 Atkyns, 37. But the strictness of the rule of that law was relaxed according to the necessity of the case; and its extreme rigor rendering it, in some cases, insufficient to the detection and punishment of crimes, the courts were compelled to prefer practical expedience to the vain attempt at theoretic perfection. Thus we find that a modern writer on the imperial criminal law, as practiced in Saxony, states that even incompetent witnesses are sometimes admitted, if the truth cannot be got at, and this particularly in facts and crimes which are of difficult proof. Gail Lib., 2. The superiority of our law consists in its laying down the rule, with its proper exceptions and limitations, and leaving nothing to the discretion of the courts. A concurrence between the two systems on general principles is thus shown; but it results from it that it would be embarassing to decide on the competency of a witness who had been declared disqualified in a State where the civil law prevails. Wherever the common law forms the basis of the jurisprudence of a State, and a witness is disqualified either by that or by statute, of which proper evidence is exhibited to a court here, I can see no reason wherefore the witness shall not be excluded. It is admitted fully that wherever the elementary writers on evidence discourse on the necessity of producing the record of conviction in order to exclude a witness, they mean a record of some court within the kingdom, of the existence of which the court is to decide on the plea of nul tielrecord; such a record, in other words, as the court might order to be brought before them by a certiorari. Conviction in another (399) country was not contemplated, because evidence of such conviction is not a record; it is only prima facie evidence of the fact, and must be judged of by the jury, in which case the competency of the witness is not questioned. Since the union between England and Ireland, an Irish judgment is a record; yet not being returnable into the King's Bench, and only provable by an examined copy, on oath, the truth of the evidence must be tried by the jury and not by the court. 5 East, 473. Considering the subject in reference to technical rules, I should believe that an English court of justice would either not notice a conviction in another country or leave it to the jury as an objection to the credibility of the witness. But the Constitution of the United States and the act of Congress made in pursuance thereof have changed the law in this respect, and furnished satisfactory ground for the exclusion of this witness. The act of Congress of 1790, ch. 11, declares "that the records and judicial proceedings, authenticated in the manner prescribed, shall have such faith and credit given them in every court within the United States as they have by law or usage in the courts of the States from whence the said records are or shall be taken." The faith and credit which would *Page 221 
be given to this record in the State of Tennessee must also be given to it in this State; and, being exhibited here, it shows that Garth has been convicted of a crime which, according to the laws of both States, render him an incompetent witness. When the act of Congress made it a record, and prescribed the manner in which it should be authenticated, it is equivalent to a record proved by inspection of a court of its own record, or an exemplification in any other court of the State where the judgment was pronounced. If this question were doubtful to me, I should be led to the same conclusion by reflecting upon the many evil, inconvenient and unjust consequences of an opposite one, always bearing in mind the rule laid down by Vaughan, 74: "When the law is knownand clear, the judge must determine as the law is, without regard to the inequitableness or inconvenience. These defects, if they happen, can only be remedied by parliament." That a witness (400) who, if he were offered in Tennessee to charge another with a dollar, should be rejected there, and be admitted here to affect life and character; that he should be received here in the State courts and rejected in the Federal courts; and that in a country where so many motives impel the citizens to explore new regions they may be followed and judicially destroyed by persons upon whom the law of their native State has set a note of infamy, are effects of so mischievous a character as to be averted, if legally possible.
On the other question relative to the admissibility of Smith, my opinion coincides with that of the judge who tried the cause. It appears to me that the witness's knowledge of the handwriting, acquired in the way he describes, is as much to be relied upon as if derived from a correspondence, and approaches nearly to that obtained from having seen the party write. It is scarcely possible, in the nature of things, that if any of the notes received by the witness throughout so long a period had been counterfeit they should not have been returned. Their not returning shows their genuineness.