[File No. 6288.]

STATE OF NORTH DAKOTA ON THE RELATION OF OLE H. OLSON, Petitioner, v. WILLIAM LANGER, Respondent.

(256 N. W. 377.)

Opinion filed September 19, 1934.

*H. G. Fuller,* for petitioner.

*P. O. Salhre,* Attorney General, *J. A. Heder,* Assistant Attorney General (*H. A. Bronson* and *Francis Murphy* of counsel) for respondent.

*Usher L. Burdick,* amicus curiæ.

BURKE, J. The petitioner, invoking the original jurisdiction of this court, petitions for a writ of quo warranto requiring the respondent to show by what right he continues to exercise the powers and duties of the office of governor of this state. Such petition is based upon the contention that the respondent has been convicted of a felony. All the pleadings, briefs, arguments and oral statements in court show that the determinative facts are not in dispute.

On November 4, 1932, the respondent was duly elected governor of this state for the term of two years, commencing in January, 1933. At the same time the petitioner was duly elected to the office of lieutenant governor for a similar term and the respondent and the petitioner qualified respectively for the office to which he was elected. On May 10, 1934, indictment was returned in the United States District Court for the District of North Dakota against the respondent, William Langer and others, charging the said defendants had wilfully and unlawfully and feloniously combined, conspired, confederated and agreed together to defraud the United States of America by corruptly administering certain Acts of Congress, to-wit:

The Act of Congress approved July 21, 1932, entitled "An Act to relieve destitution, to broaden the lending powers of the Reconstruction Finance Corporation, and to create employment by providing for and expediting a public-works program," commonly known as the "Emer-

gency Relief and Construction Act of 1932." The Act of Congress approved May 12, 1933, entitled "An Act to provide for co-operation by the Federal Government with the several States and Territories and the District of Columbia in relieving the hardship and suffering caused by unemployment, and for other purposes," commonly known as the "Federal Emergency Relief Act of 1933." The Act of Congress of June 16, 1933, entitled "An Act to encourage National Recovery, to foster fair competition, and to provide for the construction of certain useful public works, and for other purposes," commonly known as the "National Industrial Recovery Act."

The statutory offense of which respondent was convicted is defined in § 5540, U. S. Rev. St., § 37, Criminal Code, § 88, USCA title 18, which reads: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."

The respondent was convicted under this statute on the 16th day of June, 1934 and on June 29, 1934 was sentenced to imprisonment for one year and six months in the Federal penitentiary and fined $10,000. Judgment of conviction and sentence were duly entered in the records of the Federal Court in and for the district of North Dakota. The execution of said judgment and sentence has been stayed by said court pending appeal to the United States Circuit Court of Appeals of the Eighth Circuit and defendant is at liberty under supersedeas bond, but the verdict of guilty and the judgment of conviction as entered have not been vacated or set aside.

The petitioner filed his official oath and made demand upon the respondent to turn the office of governor over to him. This demand was refused. Thereupon he applied to the attorney general to institute a proceeding in quo warranto to determine who was entitled to the office. On the refusal of the attorney general to do this petitioner began the instant proceeding. His contention is that because of the conviction in the federal court, the respondent is under such constitutional disability that he is disqualified to act as governor and that the powers and

duties of the office devolve upon the lieutenant governor while such disability continues.

On the 12th day of July, 1934, the parties were present in this court by counsel and the respondent at that time filed a motion to quash, a demurrer and a return.

The motion to quash states: "Respondent moves to quash said application or petition upon the ground that such application or petition seeks to oust the respondent as Governor of this state from his office and from exercising the duties thereof by and through the exercise of the original jurisdiction of this court and in place of and by superseding the sole, original and exclusive jurisdiction of the legislative assembly, granted by the constitution, to oust the respondent from the office of Governor and from performing the duties thereof, by impeachment." Paragraph 3 of the motion states the same ground in a little different manner. Paragraph 4 states: "Respondent moves to quash said application or petition upon the ground that the same seeks to oust the respondent from the office of Governor and from performing the duties thereof for the reason of an existing disqualification and lack of eligibility to hold the office of Governor resulting from the commission of a federal crime, under constitutional and statutory provisions, to wit: because not now a qualified elector and because of loss of civil rights. That the exercise of original and, in effect, exclusive and sole jurisdiction by this court upon such subject matter would supersede and exclude the sole, original and exclusive jurisdiction possessed by the legislative assembly under the constitution, by impeachment, to find or not find, to adjudge or not adjudge, that the respondent is under disability to hold the office of Governor, . . ." Paragraph 5 states the same facts and alleges that an assumption of jurisdiction by this court "would constitute an encroachment of judicial functions in another field and department upon a subject matter expressly reserved and granted to the legislative assembly. . . ." Paragraph 6 states: "Respondent moves to quash said application or petition for the reason that the respondent as Governor and Chief Executive of this state has called a special and extraordinary session of the legislative assembly to convene at the State Capitol at Bismarck . . . to consider and act upon the questions of impeachment, the removal and the qualifications of the respondent as Governor of this state under the

constitution and the laws of this state, and that said legislative assembly will possess, as it does possess, under the constitution and laws of this state, the sole, original and exclusive jurisdiction to inquire, to investigate, and to impeach the respondent. . . ." Paragraph 7 states: "Respondent moves to quash said application or petition upon the ground that the respondent was and is a citizen of the United States; that he was and is a citizen of this state . . .; that said application seeks to oust this respondent from the office of Governor . . . by reason of said respondent being convicted and sentenced in Federal Court, after trial by jury, for the commission of a felony against the laws of the United States and the disabilities or disqualifications to hold office resulting therefrom; that such application, in seeking the exercise of the original jurisdiction of this court through quo warranto, attempts to secure the finding by this court that respondent because so convicted and sentenced in federal court for a felony has created a vacancy in the office of Governor, is disqualified as an elector, has lost his civil rights and is under disability to hold the office of Governor and perform the duties thereof; and all of this without any trial by the legislative assembly upon the subject matter or without any trial, finding or verdict by any jury of this state that respondent has violated any law of the state of North Dakota; that, as shown by said application, appeal has been duly taken from the judgment and sentence in federal court and respondent asserts that he is not guilty of the offense as charged and found; that the conspiracy for which respondent was convicted in federal court, under federal statutes, is a felony, but under the laws of the state of North Dakota, is only a misdemeanor. That . . . under federal constitution and federal laws, respondent after such conviction, sentence and appeal, still remains and is a citizen of the United States, fully possessed of all of his civil rights, including his right to vote as an elector and remains qualified to hold office, or to be a candidate for federal congress or United States Senate; that any attempt to so exercise jurisdiction of this court as sought, would deny respondent the right of trial by jury for violation of state law, would abridge the privileges and immunities of the respondent as a citizen of the United States, would deprive him of his property and rights therein, without due process of law and would deny to him the equal protection of the laws, all contrary to the 5th and 14th

amendments to the constitution of the United States and as otherwise provided."

In support of the motion to quash and in support of the demurrer and return, respondent relies upon § 194 of the constitution, which gives the house of representatives the sole power of impeachment; section 195 of the constitution which gives the senate the sole power of hearing and determining the case on impeachment and particularly upon section 196 of the constitution, which reads as follows: "The governor and other state and judicial officers, except county judges, justices of the peace and police magistrates, shall be liable to impeachment for habitual drunkenness, crimes, corrupt conduct, or malfeasance or misdemeanors in office, but judgment in such cases shall not extend further than removal from office and disqualification to hold any office of trust or profit under the state. The person accused, whether convicted or acquitted, shall nevertheless be liable to indictment, trial, judgment and punishment according to law."

Section 72 of the constitution reads as follows: "A lieutenant governor shall be elected at the same time and for the same term as the governor. In case of the death, impeachment, resignation, failure to qualify, absence from the state, removal from office, or the disability of the governor, the powers and duties of the office for the residue of the term or until he shall be acquitted or the disability be removed, shall devolve upon the lieutenant governor."

Section 73 of the constitution reads as follows: "No person shall be eligible to the office of governor or lieutenant governor unless he be a citizen of the United States, and a qualified elector of the state, who shall have attained the age of thirty years, and who shall have resided five years next preceding the election within the state or territory, nor shall he be eligible to any other office during the term for which he shall have been elected."

Section 127, as amended by article 2 of the amendments, of the constitution reads as follows: "No person who is under guardianship, non compos mentis or insane, shall be qualified to vote at any election; nor any person convicted of treason or felony unless restored to civil rights; . . ."

It seems clear that these sections of the constitution are involved and must necessarily be controlling on the question, is the governor

temporarily disqualified, and do the powers and duties of the governor devolve upon the lieutenant governor during the period of such disability? That is the question now before this court and a determination of that question in no way interferes with the right of the legislature in impeachment proceedings under §§ 194, 195 and 196 of the constitution. It may be conceded that the legislature has the sole power of removal by impeachment. This proceeding, however, is not a proceeding to remove. It is simply a proceeding to determine whether the conviction of the respondent for a felony in the United States Court for the District of North Dakota places him under a disability as contemplated in section 72 of the constitution, so that the powers and duties of the office devolve upon the lieutenant governor during the continuance of such disability.

Section 85 of the constitution lodges the judicial power in the courts of the state and reads as follows: "The judicial power of the state of North Dakota shall be vested in a supreme court, district courts, county courts, justices of the peace, and in such other courts as may be created by law for cities, incorporated towns and villages." While § 196 gives to the legislature the power of impeachment and removal from office the last sentence of the section reads: "The person accused, whether convicted or acquitted, shall nevertheless be liable to indictment, trial, judgment and punishment according to law." In the case of impeachment there might be an acquittal, but the officer could nevertheless be indicted, tried and convicted of a felony under the judicial power of the courts.

The question of jurisdiction was raised in the late Alabama case of State ex rel. Moore v. Blake, 225 Ala. 124, 142 So. 418 and the court said: "Appellant insists that a sheriff can now be removed from office only by impeachment in the manner and for causes provided by the Constitution, §§ 173 and 174. . . . Impeachment proceedings are for the removal of public officers for malfeasance while lawfully holding the office upon grounds prescribed by § 173 of the Constitution. Due process of law is essential to impeachment.

"But the vice of appellant's position is in confusing causes for removal by impeachment with ineligibility to hold the office.

"If the incumbent becomes ineligible to hold the office pending his incumbency, and continues to exercise its functions, he is a usurper,

and may be ousted by quo warranto proceedings. Such is the definite decision in State ex rel. Coe v. Harrison, 217 Ala. 80, 114 So. 905. See also State ex rel. Williams v. Owens, 217 Ala. 668, 117 So. 298."

To the same effect is Gandy v. State, 10 Neb. 243, 4 N. W. 1019.

The instant case is not the first in which a controversy has arisen between two claimants seeking to exercise the powers of governor. A similar situation has existed in several states and in each case the question has ultimately been solved by the courts.

In the case of Atty. Gen. ex rel. Bashford v. Barstow, 4 Wis. 567, the matter is gone into at great length and it is held that the court had jurisdiction.

In the early case of Atty. Gen. v. Taggart, 66 N. H. 362, 29 A. 1027, 25 L.R.A. 613 the governor of New Hampshire was disabled by illness so that he was unable to perform the duties of his office. Under the constitution and laws of New Hampshire in case of the governor's disability, the duties of the office devolve upon the president of the senate. The president of the senate refused to act. Thereupon the attorney general of the state appealed to the courts of New Hampshire for a writ of mandate to be directed to the president of the senate requiring him to take upon himself the office and exercise the powers and perform the duties thereof. The supreme court of New Hampshire, considering this question, said, among other things: "The existence of an executive vacancy is a question of law and fact within the judicial jurisdiction. If the defendant exercised executive power without a previous judgment on that question, the legality of his acts could be contested and determined in subsequent litigation; and the judicial character of the question does not depend upon the time when it is brought into court. With adequate legal process, the consideration and decision of such a question may be prospective as well as retrospective." The court exercised jurisdiction and issued the writ directing the president of the senate to perform the duties of the office.

In the case of State ex rel. Trapp v. Chambers, 96 Okla. 78, 220 P. 890, 30 A.L.R. 1144, Walton was the duly elected governor of Oklahoma. He called a special session of the legislative assembly, as he was empowered to do. After the legislature had thus convened the house voted articles of impeachment against Walton. The provisions of the Oklahoma constitution are very similar to those of our consti-

tution. The effect of the voting of articles of impeachment is to suspend the governor from his office and devolve the powers and duties thereof upon the lieutenant governor. At once when articles of impeachment were voted the governor was declared to be suspended from his office and the lieutenant governor purported to act as governor. The senate then proceeded to a consideration of the charges. Walton in this contingency appealed to the district court for an injunctional order directed to the lieutenant governor to enjoin the latter from interfering with the governor and attempting to exercise the duties of that office. Thereupon application was made to the supreme court for a writ of prohibition to be directed to the district court and for further injunctional relief aimed at Walton and requiring him to desist from interfering with the lieutenant governor in the performance of the governor's duties. Walton's contention was that the impeachment proceeding was wholly ineffectual to suspend him from office. The supreme court considering the issues as made, held that the legislature was acting within its powers in the impeachment proceeding; that under the constitution the duties of the office of governor devolved upon the lieutenant governor; that the injunctional order of the district court on Walton's application was an unwarranted interference with the legislative department and issued the writ. But the court also went further and issued its injunctional order restraining Walton from interfering with the lieutenant governor in the performance of the duties of the office of governor. Thus the court was appealed to and did pass upon the question as to who was entitled to exercise the powers and duties of the office of governor under the circumstances. In this connection see also Ferguson v. Maddox, 114 Tex. 85, 263 S. W. 888, where the court passed upon the propriety and effect of an impeachment proceeding.

In the case of People ex rel. Tennant v. Parker, 3 Neb. 409, 19 Am. Rep. 634 the governor was impeached. Under the constitution the powers and duties devolved upon the lieutenant governor. While acting as governor the lieutenant governor absented himself from the state temporarily. Thereupon the president of the senate, claiming that in such case the powers of office devolved upon him, called a special session of the legislature and the lieutenant governor, on returning, revoked the call. The court held that assuming that the call of the

special session by the president of the senate was legal that the lieutenant governor, on returning, was acting within his power in revoking the call and that thereafter no session of the legislature could properly convene on the call by the president of the senate.

In the case of People ex rel. Robin v. Hayes, 163 App. Div. 725, 149 N. Y. S. 250, at page 253 the court said: "The impeachment did not deprive William Sulzer of the office of the governor; it merely devolved the 'powers and duties of the office' upon the lieutenant governor pending the trial of the charges. . . ."

We have not overlooked the case of State ex rel. Cyr v. Long, 174 La. 169, 140 So. 13. We have considered it, and its reasoning as applied to the facts in this case, does not appeal to us.

The respondent's contention that the power to determine whether a governor shall continue in office is reposed solely in the legislative assembly under Article 14 of the constitution, is denied by § 81 of that instrument, which reads as follows: "Any governor of this state who asks, receives or agrees to receive any bribe upon any understanding that his official opinion, judgment or action shall be influenced thereby, or who gives or offers, or promises his official influence in consideration that any member of the legislative assembly shall give his official vote or influence on any particular side of any question or matter upon which he may be required to act in his official capacity, or who menaces any member by the threatened use of his veto power, or who offers or promises any member that he, the said governor, will appoint any particular person or persons to any office created or thereafter to be created, in consideration that any member shall give his official vote or influence on any matter pending or thereafter to be introduced into either house of said legislative assembly, or who threatens any member that he, the said governor, will remove any person or persons from office or position with intent in any manner to influence the action of said member, shall be punished in the manner now, or that may hereafter, be provided by law, and upon conviction thereof shall forfeit all right to hold or exercise any office of trust or honor in this state." This section of the constitution was enacted into the statutes as § 9319, Comp. Laws 1913. Thus though the legislative assembly has the sole power of removal of the governor by impeachment his conviction in the courts

of any of the acts forbidden by § 81, automatically forfeits all right to hold or exercise an office of trust or honor in the state.

After a careful examination of all of the authorities we are of the opinion that this court has jurisdiction to pass upon the question as to whether, under the circumstances conceded to exist in this case, the powers of the office of governor have devolved upon the lieutenant governor under § 72 of the constitution.

We further hold that the questions involved in this case are obviously of such nature and importance as require the exercise of the original jurisdiction of this court under § 87 of the state constitution. See State ex rel. Linde v. Taylor, 33 N. D. 76, 156 N. W. 561, L.R.A. 1918B, 156, Ann. Cas. 1918A, 583 and cases cited.

This brings us to the question as to whether there is any disability on the part of Governor Langer, which devolves the powers of the office upon the petitioner, Lieutenant Governor Olson. We have heretofore quoted the essential provisions of § 72 of the constitution. It now becomes necessary to consider other provisions of that instrument. In viewing the several provisions of the constitution material to this inquiry, we must remember that they are self-executing. They require no legislative breath to give them life; no legislative action to put them into effect. They speak for themselves and they are mandatory and prohibitory. Const. § 21.

What constitutes a disability within the meaning of that term as contained in § 72? The word disability has a reasonably definite meaning. It means: "State of being disabled; deprivation or want of ability; absence of competent physical, intellectual, or moral power, means, fitness, or the like; an instance of such want or deprivation." It connotes "want of legal qualification to do a thing; legal incapacity, incompetency, or disqualification; also, an instance or cause of such incapacity." Webster's New Int. Dict. We must presume, of course, that the words used by the framers of the constitution were used in their ordinarily accepted sense unless the contrary clearly appears. Indeed, unless given the ordinary and accepted meaning, disability would have no place in this constitutional provision. Applying that meaning to the term it must be said that the framers of the constitution contemplated that any cause, whether mental, physical, or legal, which

operated to disqualify the governor would devolve the duties of the governor upon the lieutenant governor.

Section 73 of the constitution provides that "No person shall be eligible to the office of governor . . . unless he be a citizen of the United States and a qualified elector of the state, . . ." Clearly under this provision had the governor not been an elector at the time he took office he could not have qualified. His predecessor would have been justified in refusing to turn the office over to him. This court in such case must have held that, under the provisions of § 71, his predecessor would continue to hold office until a properly qualified individual was elected. Thus the constitution requires that to hold the office of governor a person must be a qualified elector of the state. Accordingly ceasing to possess the qualifications of an elector constitutes a disability and upon this event happening the powers of the office devolve upon the lieutenant governor, just as they would in the case of the absence of the governor from the state, his insanity or his physical incapacity or inability to perform the duties of the office, as was the case in Atty. Gen. v. Taggart, 66 N. H. 362, 29 A. 1027, 25 L.R.A. 613, supra.

Article 5 of the constitution, as amended, §§ 121–129, deals with the elective franchise. Section 121 provides: "Every person of the age of twenty-one years or upwards, belong to either of the following classes who shall have resided in the state one year and in the county ninety days and in the precinct thirty days next preceding any election shall be a qualified elector at such election. First, citizens of the United States; second, civilized persons of Indian descent who have severed their tribal relation two years next preceding such election." Section 122 provides: "The legislative assembly shall be empowered to make further extensions of suffrage hereafter, at its discretion, to all citizens of mature age and sound mind, *not convicted of crime* without regard to sex; but no law extending or restricting the right of suffrage shall be enforced until adopted by a majority of the electors of the state voting at a general election" and § 127 provides: "No person who is under guardianship, non compos mentis or insane, shall be qualified to vote at any election; nor any person *convicted of treason or felony* unless restored to civil rights; and the legislature shall by law

establish an educational test as a qualification, and may prescribe penalties for failing, neglecting or refusing to vote at any general election."

Thus it is seen that § 121 deals with questions of age, citizenship and residence, and §§ 122 and 127 with questions of mental and moral qualifications as affecting the right to vote at any election. Reading all these sections together, their clear purport and effect is that one who does not possess the qualifications entitling him to vote at any election is not a qualified elector. (For a legislative enactment consistent with this construction see § 19, Comp. Laws 1913, providing: "Every elector is eligible to the office for which he is an elector, except when otherwise specially provided; and no person is eligible who is not such an elector.") It follows then that one who has been convicted of felony and whose civil rights have not been restored is not a qualified elector though he possesses every other qualification essential to that status.

It next becomes necessary to determine what is meant by "convicted of felony" within the meaning of that phrase as used in section 127, supra. When the constitution was written and adopted, the term felony had a definite and accepted meaning. The territorial statutes, §§ 6204 and 7028, 1887 Dakota Compiled Laws, defined a felony as a crime which is or may be punishable with death or by imprisonment in the territorial prison. And this was the definition accepted in nearly all the states and territories. Bouvier's Law Dict. This definition was carried into the statutes of the state and now appears therein as §§ 9197 and 10,387, Comp. Laws 1913. It is evident that when the term "felony" was used in the constitution there was no question as to what was meant thereby. It is also evident that when the phrase "convicted of felony" was used in § 127, the framers of the constitution intended to deny the right of franchise to those who had been or thereafter might be convicted of a crime punishable by death or by imprisonment in the penitentiary. In this connection § 122, supra, should also be particularly noted. By this latter section the legislative assembly is given broad powers in the way of extending the right of suffrage subject to the approval of the electors voting at a general election. But those powers are restricted in this, that the section applies only to citizens of mature age and sound mind, *not convicted of crime*. Section 122 was written into the constitution at the instance of those members of the constitutional convention who believed that the elective franchise

should be granted to women as well as to men. It was in the nature of a compromise. See Constitutional Debates, pages 185, et seq. Manifestly, when the framers of the constitution wrote these sections they had a clear and definite purpose in mind. They intended, for reasons of public policy (to protect the state—not to punish the individual) that the elective franchise should not be enjoyed by those who had been convicted of crime amounting to felony and whose civil rights had not been restored. They were so insistent upon this that when they inserted § 122 providing for the extension of the suffrage to women, they required that it should not be extended to those who had been convicted of crime. Thus the requirements of § 122 are consistent with the requirements imposed by § 121 as to age, citizenship and residence, and those imposed by § 127 as to mental and moral qualifications. And the people when they approved that evident purpose by adopting the constitution were acting wholly within their rights.

"A state has an undoubted right to provide in its constitution that persons may be . . . . deprived of the right of suffrage by reason of their having been convicted of crime. The manifest purpose of such restrictions upon this right is to preserve the purity of elections. The presumption is that one rendered infamous by conviction of felony, or other base offense indicative of moral turpitude, is unfit to exercise the privilege of suffrage. . . . The exclusion must for this reason be adjudged a mere disqualification, imposed for protection and not for punishment, the withholding of a privilege and not the denial of a personal right." 9 R. C. L. 1042. See also 20 C. J. 60. As the supreme court of North Carolina, considering a constitutional provision similar to the one involved in the case at bar, said: "The disqualification for office and the loss of the right of suffrage imposed by article six of the constitution, upon persons convicted of infamous offences, constitute no part of the judgment of the court, but are mere consequences of such judgment." State v. Jones, 82 N. C. 685.

The underlying theory cannot be better stated than it was in Washington v. State, 75 Ala. 582, 51 Am. Rep. 479: "It may be laid down as a sound proposition, using the language of Mr. Cooley, that 'participation in the elective franchise is a privilege rather than a right, and it is granted or denied on grounds of general policy; the prevailing view being that it should be as general as possible, consis-

tent with the public safety.' Cooley, Const. Lim. 5th ed. 752 (599). Mr. Story, without undertaking to say whether it has its foundation in natural right or not, says it 'has always been treated in the practice of nations as a strictly civil right, derived from and regulated by each society according to its own free will and pleasure.' 1 Story, Const. 4th ed. §§ 579–582. The weight of both reason and of authority, however, as we shall see, supports the view that political suffrage is not an absolute or natural right, but is a privilege conventionally conferred upon the citizen by the sovereignty. There can be practically no such thing as universal suffrage, and it is believed that no such theory is recognized among any people. Some are necessarily excluded on the ground of infancy, and the privilege is infinitely varied among others, either upon the ground of public policy, or for reasons that seem arbitrary. No one can lawfully vote under any government of laws except those who are expressly authorized by law. It is well settled therefore under our form of government, that the right is one conferred by constitutions and statutes, and is the subject of exclusive regulation by the State, limited only by the provisions of the Fifteenth Amendment to the Federal Constitution, which prohibits any discrimination on account of 'race, color, or previous condition of servitude.' Cooley, Const. Lim. 5th ed. 752 et seq.; McCrary, Elections, 2d ed. § 3; Brightly, Elections Cases, 27; Huber v. Reily, 53 Pa. 112. The States having the power to confer or to withhold the right, in such manner as the people may deem best for their welfare, it necessarily follows that they may confer it upon such conditions or qualifications as they may see fit, subject only to the limitation above mentioned. As said in United States v. Cruikshank, 92 U. S. 542, 23 L. ed. 588, 'the right to vote in the States comes from the States; but the right of exemption from political discrimination comes from the United States.' . . .

."The right is also denied almost universally to idiots, insane persons, and minors, upon the ground that they lack the requisite judgment and discretion which fit them for its exercise. It has never been considered that any of these disqualifications were imposed as a punishment, and no one has thought to view them as even in a nature of a penalty. The same may be asserted as to the exclusion of unnaturalized citizens who are disqualified on the ground of alienage, and of paupers, to whom some States deny the right upon principles of State

policy. It is quite common also to deny the right of suffrage, in the various American States, to such as have been convicted of infamous crimes. The manifest purpose is to preserve the purity of the ballot-box, which is the only sure foundation of republican liberty, and which needs protection against the invasion of corruption, just as much as against that of ignorance, incapacity, or tyranny. The evil infection of the one is not more fatal than that of the other. The presumption is, that one rendered infamous by the conviction of felony, or other base offense indicative of great moral turpitude, is unfit to exercise the privilege of suffrage, or to hold office, upon terms of equality with free-men who are clothed by the State with the toga of political citizenship. It is proper therefore that this class should be denied a right, the exercise of which might sometimes hazard the welfare of communities, if not that of the State itself, at least in close political contests. The exclusion must for this reason be adjudged a mere disqualification, imposed for protection, and not for punishment—withholding an honorable privilege, and not denying a personal right or attribute of personal liberty. Pom. Const. Law, § 535; Anderson v. Baker, 23 Md. 531; Blair v. Ridgely, 41 Mo. 63; Ex parte Stratton, 1 W. Va. 305; Kring v. Missouri, 107 U. S. 221, 27 L. ed. 506, 2 S. Ct. 443."

The respondent, however, insists that though a conviction of felony in the state courts results in disqualifying the defendant as an elector under § 127, nevertheless this is not so where a conviction is had in the federal courts. In support of this contention he cites, among others, the following cases: Wisconsin v. Pelican Ins. Co. 127 U. S. 265, 32 L. ed. 239, 8 S. Ct. 1370; Logan v. United States, 144 U. S. 263, 36 L. ed. 429, 12 S. Ct. 617; Hildreth v. Heath, 1 Ill. App. 82; Garitee v. Bond, 102 Md. 379, 62 A. 631, 111 Am. St. Rep. 385, 5 Ann. Cas. 915; Com. v. Green, 17 Mass. 515 (compare Com. v. Hall, 4 Allen, 305); State v. Landrum, 127 Mo. App. 653, 106 S. W. 1111; State ex rel. Mitchell v. McDonald, 164 Miss. 405, 145 So. 508, 86 A.L.R. 290; Re Ebbs, 150 N. C. 44, 63 S. E. 190, 19 L.R.A.(N.S.) 892, 17 Ann. Cas. 592; National Trust Co. v. Gleason, 77 N. Y. 400, 33 Am. Rep. 632; Sims v. Sims, 75 N. Y. 466; People v. Gutterson, 244 N. Y. 243, 155 N. E. 113; Re Kaufmann, 245 N. Y. 423, 157 N. E. 730; Queenan v. Territory, 11 Okla. 261, 71 P. 218, 61 L.R.A. 324; Weber v. State, 18 Okla. Crim. Rep. 421, 195 P. 510; Ex parte Biggs,

52 Or. 433, 97 P. 713; State v. Du Bose, 88 Tenn. 753, 13 S. W. 1088; Brown v. United, States (C. C. A. 6th) 233 F. 353, L.R.A. 1917A, 1133, and note; Goldstein v. State, 75 Tex. Crim. Rep. 390, 171 S. W. 709; Ex parte Quarrier, 2 W. Va. 569. The pioneer in this line of cases is Com. v. Green, 17 Mass. 515, supra. The reasoning in this case is approved and the case is cited as authority in practically all of the other cases relied on by the respondent. The point in the case was as to whether a witness was rendered incompetent to testify in the state of Massachusetts by reason of his conviction of felony in the state of New York.

Mr. Greenleaf, in his work on Evidence, ¶ 376, citing Com. v. Green, says: "Whether judgment of an infamous crime, passed by a foreign tribunal, ought to be allowed to affect the competency of the party as a witness, in the courts of this country, is a question upon which jurists are not entirely agreed. But the weight of modern opinion seems to be, that personal disqualifications, not arising from the law of nature, but from the positive law of the country, and especially such as are of a penal nature, are strictly territorial, and cannot be enforced in any country other than that in which they originated. Accordingly, it has been held, upon great consideration, that a conviction and sentence for felony in one of the United States did not render the party incompetent as a witness in the courts of another state; though it might be shown in diminution of the credit due to his testimony." Professor Wigmore, in his work on Evidence, 2d ed. vol. 1, ¶ 522, cites the foregoing statement with approval. Commenting on the Green Case he summarizes the reasons for the holding therein as follows: "(1) The difficulty of raising an issue as to the record, (2) the diversity of ideas as to criminal conduct in different countries, (3) the hardship of disqualifying by old and forgotten offenses in other lands, (4) the principle that penal laws have no effect beyond the jurisdiction, (5) the fact that infamy is a punishment as well as stigma on character." While these several reasons are considered in the Green Case, the principal argument of Chief Justice Parker in that case is that incompetency to testify is a part of the penalty and to exclude the testimony of a witness on account of a conviction is to give effect to it and enforce the punishment, by which means the penal laws of one country would reach into others. He says: ". . . A disparagement

of character, and incompetency to testify, are a part of the punishment of crime, either at the common law, or by statute. If the penalty do not exist beyond the jurisdiction, against which the crime was committed; then incompetency, which is the effect and consequence of crime, and part of the penalty, cannot reach beyond the limits of the state, whose laws have been violated." We must remember, too, if the now obsolete rule of evidence which prevented a witness from testifying in any court because of his conviction of a felony were strictly adhered to, that in most instances the onus of such disqualification would fall upon the public or upon innocent third parties. On account of this and other reasons there has been a general tendency to depart from this ancient rule as is evidenced by statutory enactment and judicial decision in numerous jurisdictions. See Rosen v. United States, 245 U. S. 467, 62 L. ed. 406, 38 S. Ct. 148; 5 Jones, Ev. 2d ed. § 2101, et seq., and cases cited. So generally now, unless the statute expressly provides that a witness shall be rendered incompetent because of conviction of crime, he is permitted to testify and the fact of his conviction may be shown for the purpose of impeachment and in diminution of the credit due to his testimony. For an example of the application of one form of this rule in this state, see State v. Kent (State v. Pancoast) 5 N. D. 516, 67 N. W. 1052, 35 L.R.A. 518.

We have heretofore considered the underlying principle of § 127 and the purpose at which the disqualifying provision thereof is aimed. That purpose is the protection of the state by denying the privilege of the franchise to those whose unfitness is evidenced by conviction of felony. This disqualification is not a penalty. It is merely a consequence attendant on and incidental to the doing of the felonious act. The commission of the act and not the conviction therefor works the disqualification, but the judgment of conviction is made conclusive evidence of its commission to be accepted as such where the question arises. In so far as the first three reasons stated by Professor Wigmore in his analysis of the Green Case for the holding therein are concerned, it is clear that none of these can be urged in a case like the one at bar. Here the conviction in question was in the Federal Court for the District of North Dakota. Article 6 of the constitution of the United States provides: "This constitution and the laws of the United States which shall be made in pursuance thereof . . . shall

be the supreme law of the land; and the judges in every state shall be bound thereby . . ." And § 3 of the constitution of North Dakota provides: "The state of North Dakota is an inseparable part of the American union and the Constitution of the United States is the supreme law of the land." So that it is only in a special and limited sense that the state and federal jurisdictions may be considered as foreign to each other. See also 59 C. J. 28, et seq., and cases cited.

It seems to us unthinkable in view of the purpose underlying § 127 and the inter-relationship between the state and the United States, that an elector who has committed the most serious of offenses—for example, treason, or murder, or robbery—and who has been convicted therefor in the federal court, should not be disqualified to exercise the elective franchise in North Dakota where the offense was committed. Neither can the fact that the offense of which the respondent in the instant case was convicted may by some be considered as not a serious one make any difference in the application of the rule. The constitutional provision establishes a rule for all cases and in its application the merits of any individual case cannot be considered. So it is clear that none of the reasons urged in Commonwealth v. Green, supra, are at all applicable in such case. On the contrary every logical reason supports the disqualification. As sustaining this view see the following cases: Barnes v. District Ct. 178 Cal. 500, 173 P. 1100; Re O'Connell, 184 Cal. 584, 194 P. 1010; Re Kerl, 32 Idaho, 737, 188 P. 40, 8 A.L.R. 1259; Re Minner, 133 Kan. 789, 3 P. (2d) 473, 79 A.L.R. 35; Cowan v. Prowse, 93 Ky. 156, 19 S. W. 407; Re Peters, 73 Mont. 284, 235 P. 772; State ex rel. Anderson v. Fousek, 91 Mont. 448, 8 P. (2d) 791, 84 A.L.R. 303; State v. Foley, 15 Nev. 64, 37 Am. Rep. 458; State v. Candler, 10 N. C. (3 Hawks) 393; Chase v. Blodgett, 10 N. H. 22; Re Hodgskin, 193 App. Div. 217, 183 N. Y. S. 401; Re Lindheim, 195 App. Div. 827, 187 N. Y. S. 211; Seitz v. Ohio State Medical Bd. 24 Ohio App. 154, 157 N. E. 304; State ex rel. Beckman v. Bowman, 38 Ohio App. 237, 175 N. E. 891; Re Elliott, 122 Okl. 180, 253 P. 103; Re Kirby, 10 S. D. 322, 414, 73 N. W. 92, 907, 39 L.R.A. 856, 859; Re Finch, 156 Wash. 609, 287 P. 677; Re Comyns, 132 Wash. 391, 232 P. 269.

Some of the foregoing cases deal with the question of competency of witnesses. Some are disbarment cases. But the case of State ex

rel. Anderson v. Fousek, 91 Mont. 448, 8 P. (2d) 791, 84 A.L.R. 303, and State ex rel. Beckman v. Bowman, 38 Ohio App. 237, 175 N. E. 891, supra, are cases which in principle are identical with the case at bar. In the Anderson Case, decided in 1932, Anderson was lieutenant of the police force of the city of Great Falls. The statute of Montana (Rev. Code 1921, § 511) provides that "An office becomes vacant on the happening of either of the following events before the expiration of the term of the incumbent:  .   .   .  8. His conviction of a felony  .   .   ." Anderson was convicted in the Federal Court for the District of Montana under § 88, USCA, title 18, for the offense of which the respondent in the instant case was convicted. The mayor of the city of Great Falls ordered his discharge from the police force on the assumption that by virtue of his conviction Anderson's office became vacant under the section of the Montana statute heretofore referred to. Anderson resisted the discharge contending that a conviction of felony in the federal court was not a conviction of felony within the meaning of the statute. The court, however, held that the rule declared by the statute applied equally to one convicted under the federal law and under the state law and sustained the action of the mayor.

In the Beckman Case, Beckman was a policeman in the city of Cincinnati. Under § 45 of the rules and regulations governing the handling and distribution of the police relief fund of the city of Cincinnati, it was provided that "Any member of the police department  .  .  . discharged for any offense other than  .   .   . being convicted of a felony" shall be entitled to participate in the fund. Beckman was convicted in the Federal Court under § 88, title 18, USCA, the same statute under which the respondent here was convicted. Thereupon Beckman was discharged and was denied the right to participate in the police relief fund. He brought an action to compel the board of trustees of the fund to grant his application for a pension. He contended that conviction of a felony in the federal court was not a conviction of a felony within the meaning of that term as set out in the rules and regulations for the handling and distribution of the relief fund. The court said, speaking of this contention, "The other proposition suggested by counsel would lead to this, that, notwithstanding a member of the police department of the city of Cincinnati might

be indicted and convicted of a robbery in another state, and escape and return to duty, it would not bar him under the terms of § 45. The section says 'who is discharged for any offense other than . . . being convicted of a felony.' Certainly it has reference to the conviction of felony in any jurisdiction, and the character of the offense must be construed under the laws of the jurisdiction where committed."

The respondent further insists, that even if a conviction of felony in the federal court be within the contemplation of § 127, nevertheless such conviction must be for an offense also made felony by the statutes of the state; that, in the instant case, the conviction in the federal court was for conspiracy under § 88, 18 USCA, supra, while under the statutes of North Dakota, §§ 9441, et seq., Comp. Laws 1913, such offense is only a misdemeanor, and, accordingly, there was no conviction of felony within the meaning of that term in § 127. In disposing of this contention, we again must look to the theory and purpose underlying the constitutional provision. As we have shown, the reason for the disqualification therein provided is to protect the state by insuring that only those mentally and morally qualified shall participate in its elections. Acts constituting felony may differ in different jurisdictions. Statutes simply embody the standard established by the public conscience in those jurisdictions where they are enacted. Public sentiment may vary and standards change accordingly. But he who violates the statute must be held to know what he is doing when he does the prohibited act and to know the consequence in the way of penalty. His personal standard cannot be the measure of the character of the act or its depravity. The standard established by the law-making body of that jurisdiction must do that. State v. Malusky, 59 N. D. 501, 230 N. W. 735, 71 A.L.R. 190; State ex rel. Anderson v. Fousek, 91 Mont. 448, 8 P. (2d) 791, 84 A.L.R. 303, supra; State ex rel. Beckman v. Bowman, 38 Ohio App. 237, 175 N. E. 891, supra. Accordingly, he who sets himself above the law and does an act, regarded by the United States as of so serious a nature as to be prohibited and penalized as a felony, may well be held in this state to be unfit to participate in governmental affairs. See in Re Minner, 133 Kan. 789, 3 P. (2d) 473, 79 A.L.R. 35, supra. We therefore hold that consistent with the theory and purpose of § 127, whether an offense for which a conviction is had is a felony must

be determined by the law of the jurisdiction where it is committed.

The respondent claims that his conviction of a felony does not deprive him of his rights as an elector until such time as the judgment of conviction shall be finally affirmed upon appeal and he be actually confined in the penitentiary.

In considering the merits of this contention we must bear in mind the purpose underlying the constitutional disqualification and the nature of the consequences that result from it. As we have shown, the purpose is the protection of the public; the disqualification is an incidental consequence and not a punishment or penalty.

When a person is convicted of a felony the presumption of guilt immediately attaches, and this presumption is not destroyed or abrogated by an appeal. It is against public policy and against the best interests of sound government that one convicted of a felony shall continue to exercise his right to the elective franchise and to enjoy the privileges and prerogatives of an elector. The rights of the public must be paramount to the rights of the individual. And the right of the individual to participate in government as an elector must give way to the public interest so that the public may know that the purity of the ballot-box is insured and thus have confidence in the honor and rectitude of its officials. It is true that this may work a hardship upon the individual because it is possible his conviction may be reversed upon appeal and ultimately he may be found innocent; and therefore some may believe that in a sense he was wrongfully deprived of his enjoyment of the elective franchise and the privileges which go with it. But, on the other hand, his conviction may be affirmed (presumptively it will be) and we would have the anomalous situation of an individual holding the great office of governor of a state found by the jury to be guilty of a felony and sentenced to a federal penitentiary, yet continuing during the pendency of his appeal to be and to act as the chief executive of the state, entrusted with the enforcement of the constitution and the laws, as well as having the personal and private right to enjoy the rights, duties, privileges, honors and emoluments of his great office. If an appeal allowed and permitted a citizen convicted of a felony to retain the rights and privileges of an elector, including the right to hold office during the interval of his appeal, the object of the statute and the constitution would, in most cases, be wholly defeated;

because, as a matter of common knowledge, appeals take time. They sometimes occupy months or years, and, hence, a convicted elector would, if an officer, in most instances serve out his complete term and might even be re-elected during the pendency of his appeal, though judgment of conviction should be ultimately affirmed. Hence the public would have no redress and its rights would be entirely overlooked and ignored.

It seems to us that the provisions of the constitution itself point to this holding on the question. Section 198 of that instrument reads as follows: "No officer shall exercise the duties of his office after he shall have been impeached and before his acquittal." The voting of an impeachment by the house of representatives follows upon what is little more than a preliminary examination or investigation. The articles of impeachment in themselves constitute the information or charge upon which the party impeached is prosecuted and tried by the senate. Yet, before the officer impeached is even tried upon this information, he is, by the terms of this section, suspended from office and deprived of the right to exercise any of the duties thereof. If it seems harsh to deprive a citizen of the right of franchise and the consequent right to hold office after his trial, conviction and sentence in the Federal Court, what can be said of the provisions of section 198 of the constitution which deprive a constitutional officer of his right to hold office and to exercise the duties thereof upon mere impeachment before trial and before there has been any conviction?

The legislature also by its enactments has indicated its approval of this policy with respect to public officers subject to removal under statutory provisions. Chapter 184, Sess. Laws 1919 (§ 685, 1925 Supplement) provides: "The governor may remove from office any county commissioner, clerk of the district court, county judge, sheriff, coroner, county auditor, register of deeds, state's attorney, county treasurer, superintendent of schools, county commissioners, surveyor, public administrator, city auditor, city treasurer, any city commissioner, mayor, chief of police, police magistrate, deputy sheriff, or other police officer, or any custodian of public moneys, except the state treasurer, whenever it appears to him by competent evidence and after a hearing as hereinafter provided that such officer has been guilty of misconduct,

malfeasance, crime in office, neglect of duties in office, or for habitual drunkenness or gross incompetency."

Chapter 199, Sess. Laws 1915 (§ 686, 1925 Supplement) provides for the filing of charges against officers so removable by the governor and for the prosecution of the same. The same chapter (§ 688, 1925 Supplement) after making provision for the appointment of a commissioner to hear and take testimony in such prosecution, further provides: ". . . and the governor, in his discretion may, if in his judgment the best interests of the state shall require it to be done, by written order to be delivered to such officer, suspend such accused officer from the performance of duty during the pendency of the hearing. If the governor shall so suspend the accused, he shall immediately notify the board or persons authorized to fill a vacancy of such office, and thereupon such board or persons shall, within five days after receipt of such notice, appoint some competent person to fill such office and perform the duties thereof ad interim." And if after a hearing the governor finds against the officer, the latter has a right of appeal. Section 690, Supplement, as amended. But pending the appeal he is deprived of his office.

This question was raised in the case of McKannay v. Horton, 151 Cal. 711, 91 P. 598, 13 L.R.A.(N.S.) 661, 121 Am. St. Rep. 146. On June 13, 1907, Eugene E. Schmitz, mayor of San Francisco, California, was convicted of a felony and duly appealed. The board of supervisors declared a vacancy in the office of mayor and appointed Charles Boxton to fill the unexpired term. Schmitz continued to act as mayor and refused to vacate the office or to recognize the authority of Boxton. The court said: "No man has a property right in an office paramount to the public interest. He has a property right in the salary and emoluments of an office while he is capable of discharging and actually discharges its duties; but when, by his fault or misfortune, he is no longer able to render the service, the public interests demand that he shall give way to some one who can. An official who is declared insane is simply unfortunate; but he ceases to be an official. An innocent man who is unjustly convicted of a felony is doubly unfortunate; but the fact that he may by means of an appeal ultimately succeed in establishing his innocence does not entitle him in the meantime to hold on to a public office which he is no more capable

of serving than if he were insane. The law allows an appeal from a conviction of felony because, so far from being against the public interest, it is promotive of the public interest that a person accused of crime should have every reasonable opportunity of vindicating his innocence. But, if the person so convicted is the incumbent of a public office, these considerations do not weigh in favor of retaining him in that position pending an appeal. The pendency of the appeal does not affect the presumption of guilt, which arises immediately upon the rendition of the verdict; . . . The only effect of an appeal and certificate of probable cause is to stay the execution of the judgment. Removal from office is not a part of the judgment of conviction in cases of felony, though a consequence which flows from it. . . ."

To the same effect is the case of Re Obergfell, 239 N. Y. 48, 145 N. E. 323, in which the court said: "Section 30 of the Public Officers Law (Consol. Laws, chap. 47) provides that: 'Every office shall be vacant upon the happening of either of the following events before the expiration of the term thereof: 1. The death of the incumbent. . . . 5. His conviction of a felony, or a crime involving a violation of his oath of office.' The argument is made that the certificate of reasonable doubt, by staying the execution of the judgment, has stayed also the creation of a vacancy, or, if a vacancy exists, the right to fill it. We read the statute otherwise. The abridgment of the term upon the conviction of the incumbent is not a punishment for his offense. Re Rouss, 221 N. Y. 81, 116 N. E. 782. It is an automatic limitation upon the duration of his office. McKannay v. Horton, 151 Cal. 711, 91 P. 598, 13 L.R.A.(N.S.) 661, 121 Am. St. Rep. 146. The application of the statute is not defeated by the possibility that the judgment may be reversed. That possibility would be present though a certificate had not been granted and the incumbent were in jail. The statute does not mean that a vacancy shall exist in those cases, and those only, where the incumbent is subjected to physical restraint. Its meaning is that one convicted of a felony shall not retain a post of honor. McKannay v. Horton, 151 Cal. 711, 91 P. 598, 13 L.R.A.(N.S.) 661, 121 Am. St. Rep. 146, supra.

In the case of State ex rel. Blake v. Levi, 109 W. Va. 277, 153 S. E. 587, one O. E. Camp, superintendent of free schools in Kanawha County, was found guilty by a jury on an indictment involving a vio-

lation of official duty and was sentenced to the penitentiary. He prosecuted an appeal and his counsel strenuously urged that his office would not become vacant under the statute until final adjudication in the appellate court. The Supreme Court of Appeals of West Virginia disagreed with this view and said: "The robe of innocence with which the law invested Mr. Camp during trial was stripped from him by the verdict of the jury. The judgment of the court has put upon him the garb of guilt. A legal as well as laical presumption has now arisen that his conviction is just. Jones, Commentaries on Ev. 1st ed. § 12d; 2 Bishop, New Crim. Proc. 2d ed. § 1103; Underhill, Crim. Ev. 3d ed. § 42; 17 C. J. p. 225, § 3571; Hawkins v. State, 142 Tenn. 238, 218 S. W. 397. It is essential to our government that public officials have the confidence of the people. That confidence cannot extend to an official under conviction for malfeasance in office. His rights are subordinate to the public weal. The possibility that his conviction may ultimately be reversed cannot weigh against public dissatisfaction with, and public mistrust of him pending appellate hearing. Public policy demands a rigid construction of this law as well as its rigid enforcement. With pitiless propriety the Supreme Court of Virginia said, that when the people established the Constitution they never intended that a public office 'should be contaminated by the presence of a convicted . . . felon.' Com. v. Fugate, page 726 of 2 Leigh." As to what is meant by the term "conviction," see Smith v. Com. 134 Va. 589, 113 S. E. 707, 24 A.L.R. 1286; People ex rel. Fleming v. Shorb, 100 Cal. 537, 35 P. 163, 38 Am. St. Rep. 310; Toncray v. Budge, 14 Idaho, 621, 95 P. 26.

We have read with great care and have fully analyzed all the cases cited by the respondent in support of the proposition that an appeal from a judgment of conviction of felony suspends the disqualification, as well as the penalty for punishment, which attaches directly to the judgment itself. The cases of People v. Fabian, 192 N. Y. 443, 85 N. E. 672, 18 L.R.A.(N.S.) 684, 127 Am. St. Rep. 917, 15 Ann. Cas. 100; State v. Houston, 103 N. C. 383, 9 S. E. 699; Donnell v. Medicine Bd. of Registration, 128 Me. 523, 149 A. 153; are not in point, because in all of these cases the record conclusively shows that the court found there had never been a "conviction" of a felony for the reason that while verdicts of guilty had been returned, no judgments had ever

been entered upon such verdicts, or that judgments had·been suspended and therefore there had never been a completed conviction within the meaning of that term.

·· The case of State v. Olson, 200 Iowa, 660, 204 N. W. 278, is also not in point. It merely carries out the general thought that where no judgment is entered and sentence is suspended disqualification to hold office does not follow.

The case of Hazelrigg v. Douglass, 126 Ky. 738, 104 S. W. 755, is also not in point. This was a criminal action indicting three judges· of the fiscal court for malfeasance in office. The charge was a misdemeanor. The constitution and the statutes of Kentucky provided specially for an appeal from this particular offense and the supreme court of Kentucky construed the statute to mean that the appeal being specially provided for stayed not only the judgment of the fine of one hundred dollars but also that part of the judgment imposing the penalty of a vacancy in office.

In the case of Harmon v. Powers, 78 Kan. 135, 96 P. 51, 17 L.R.A. (N.S.) 502, 16 Ann. Cas. 121, the Kansas Court held that under the statutes of Kansas the defendant Harmon's civil rights were not suspended until he actually began his term of sentence in the penitentiary. This case is not in point on the question now before us as to whether or not disqualification to vote follows immediately upon a conviction of felony under § 127 of the constitution.

The only case we have discovered which holds directly in accordance with the respondent's contention is Re Advisory Opinion to Governor, 75 Fla. 674, 78 So. 673. There the supreme court of Florida rendered an advisory opinion upon a request by the governor. The Florida constitution provided for the suspension of an officer convicted of a felony, such suspension by the governor to continue until the next session of the legislature. The advisory opinion of the supreme court reads: "While an officer may be suspended from office 'for the commission of any felony,' . . . the office is not 'deemed vacant' under § 298 of the General Statutes, . . . except upon 'conviction,' and a conviction is not operative while a supersedeas is effective." No reasons are stated and no authorities are cited in support of the holding.

We therefore conclude from a review of the authorities, that when a defendant is convicted of a felony in this state his disqualification

as an elector attaches immediately, and that this disqualification is not suspended by his appeal and the furnishing of a supersedeas bond.

Finally, the respondent contends that for this court to exercise jurisdiction as the petitioner prays that it do, will, as against the respondent, transgress the 5th and 14th amendments to the constitution of the United States. In that behalf respondent, stating his contention in his brief, says: "That, as a matter of law under federal constitution and federal laws, respondent after such conviction, sentence and ·appeal, still remains and is a citizen of the United States, fully possessed of all of his civil rights, including his right to vote as an elector and remains qualified to hold office or be a candidate for federal congress or United States Senate; that any attempt to so exercise jurisdiction of this court as sought, would deny respondent the right of trial by jury for violation of state law, would abridge the privileges and immunities of the respondent as a citizen of the United States, would deprive him of his property and rights therein, without due process of law and would deny to him the equal protection of the laws, all contrary to the 5th and 14th amendments to the constitution of the United States and as otherwise provided."

We have given careful consideration to this contention and are of the opinion that our exercise of original jurisdiction and the granting of the relief prayed for by the petitioner do not in any way contravene the 5th and 14th amendments to the constitution of the United States. It seems to us that the matter is wholly governed by the provisions of the constitution of North Dakota and we have determined it accordingly.

Accordingly, we hold that William Langer, the respondent in the instant proceeding, by reason of his conviction of a felony in the United States Court for the District of North Dakota, suffered a disability within the meaning of that term in § 72 of the constitution, so that the powers and duties of the office of governor devolved upon the petitioner, the Lieutenant Governor Ole H. Olson, for the residue of the term of office for which the respondent was elected or until such disability be removed.

The writ will issue.

BURR, Ch. J., and NUESSLE, J., and McKENNA, Dist. J., concur.

CHRISTIANSON, J., disqualified, did not participate; Hon. GEO. M. McKENNA, Judge of Third Judicial District, sitting in his stead.

Filed September 28, 1934.

MOELLRING, J. (dissenting). It is my view that the majority opinion in this case is based upon a wrong premise, by reason of which the superstructure erected thereon cannot stand. The underlying theory sustaining the order ousting the respondent from the duties of the office of governor is, briefly, that a conviction of a felony in a federal court works a disqualification as to an elector in this state, under § 127 of the Constitution of North Dakota, and that, as one of the qualifications for governor requires that he be a qualified elector of the state, without such qualification at any time during his term of office, a disability occurs, and the duties of the office, ipso facto, devolve upon the lieutenant-governor.

As I view this matter, the error in the first instance, lies in the construction placed upon § 127 of the Constitution of this state. This section reads:

"No person who is under guardianship, non compos mentis or insane, shall be qualified to vote at any election; nor any person convicted of treason or felony unless restored to civil rights; . . ."

A controversy arises over the meaning of the word "felony" as contained in this section of the constitution. Does it mean "felonies" as defined and punishable by the laws of North Dakota, or does it mean, in addition thereto, such other felonies as are defined and punishable in other jurisdictions, such as the jurisdictions of the various states, or of the United States, or of a foreign country?

It is plain to me that this term in the Constitution means felony as defined by the laws of this state only, and punishable under such laws; and I am unable to read into this section of our constitution that the term "felony" as used therein, as a disqualifying act, includes felonies as defined by the laws of the United States or of the laws of the various states. It is a well established rule that in construing the provisions of a constitution, where there may be doubt as to the meaning, in arriving at a conclusion we should gather the purpose and intention of the framers of the constitution.

Section 127 states that no person who is under guardianship, non compos mentis, or insane, shall be qualified to vote at any election, "nor any person convicted of *treason or felony* unless restored to civil rights." Section 19 of the State Constitution defines treason as follows: "Treason against the state shall consist only in levying war against it, adhering to its enemies or giving them aid and comfort." (Italics ours.)

It is evident, therefore, that the treason mentioned in connection with the word "felony" in § 127 of the Constitution, has reference to treason committed against the state of North Dakota only; and this was evidently the view of the code commission authorized by the legislative assembly after the adoption of the constitution, as the commission presented to the legislature and there was enacted the measure as contained in § 7043, Code of 1895 (Comp. Laws 1913, § 9447), which provides:

"Every person owing allegiance to this state who levies war against it, or adheres to its enemies or gives them aid or comfort within this state or elsewhere, is guilty of treason. . . . ."

In attempting to determine the meaning of the word "felony" as contained in this section, in view of the definition of treason as it is found in the constitution,—and as subsequently enacted in the statute,—did the framers of the constitution have in mind, at the time of the adoption of this particular section, that the term "treason" was used in a restrictive sense, and applied singularly to treason against the state, and then, with only the connective "or" between, use the term "felony" in the broadest sense, and include felonies committed, not only against the laws of this state, but against the laws of all the other states, or of the United States?

It is significant that treason is regarded by all of the states and the federal government, as well as practically all other governments of the world, as a greater offense than felony; and why would the framers of our state constitution, therefore, use the term "treason" in a restricted sense as applicable to this state only, and then immediately, in the same sentence, use the term "felony" in its broadest sense. As the framers of the constitution certainly confined their efforts to formulating fundamental laws for the territory comprised within the new state only, I have every reason to believe that they did not concern

themselves with what other states or jurisdictions might wish to legislate upon the subject of felony, or what offenses they would place in that category.

In determining what the makers of the constitution had in mind at the time of the adoption of this section of our constitution, considerable light is shed upon the situation by the historical setting or environment at the time. Thus, we find that at the time of the assembly of the Constitutional Convention in the summer of 1889, there existed in the laws of the Territory of Dakota, a specific definition of felony. The Penal Code of the Compiled Laws of Dakota for 1887, § 6204, defines felony in the following language: "A felony is a crime which is, or may be, punishable with death, or by imprisonment in the territorial prison."

' We find in the criminal procedure of the same code (§ 7028) that felony is again defined in precisely the same language. It should be noted that in both instances the offense is defined as one which is punishable with death or by imprisonment in "the territorial prison." The language clearly signifies that the offense contemplated is one confined exclusively to the Territory of Dakota, and not otherwise, as it states that the punishment therefor is in "the territorial prison," as distinguished from any other prison, and means that it is such crime only that the punishment must be exacted in the particular prison provided by the Territory of Dakota.

After the adoption of the constitution by the electors, the legislative assembly provided for a code commission to prepare and codify laws for the new state; and in pursuance thereof the commissioners performed their duties and submitted the result of their efforts to the Legislative Assembly of 1895. This code commission and the legislature, no doubt with the territorial laws in mind, and the new constitution, had occasion to define the term "felony," and as found in the Revised Codes of North Dakota for 1895. The Penal Code, § 6804, defines the offense as follows: "A felony is a crime which is or may be punishable with death or *imprisonment in the penitentiary;* every other crime is a misdemeanor. . . ." (Italics ours.) The criminal procedure of the same code, § 7743, likewise defines a felony in the same identical language. Thus, we have the definition of felony, as contained in the laws of the new state, incorporating the definition of fel-

ony under the territorial laws, in its exact language, except that the imprisonment in "the territorial prison" is changed to imprisonment in "the penitentiary," meaning, of course, the penitentiary of the state of North Dakota.

If the members of the Constitutional Convention had intended the conviction of a felony, as defined in any other jurisdiction, to work a disqualification as to an elector of this state, or to disqualify a governor, I have every reason to believe that they were sufficiently familiar with the English language, and the meaning of legal terms, to clearly express such intention. Of the seventy-five members comprising the convention, twenty-five were lawyers, several of whom became eminently known in the profession, and some as distinguished jurists of this state.

The majority opinion cites certain cases as authority for the determination of this case, in the manner that it has been determined, which cases I shall analyze and discuss later; but suffice it to be said that none of these cases cited as authority were in existence at the time our constitution was framed, or for several years thereafter, except a few early cases of an isolated character, which had been subsequently discredited as authorities prior to the time of the convention. Nor do they shed any light on the construction of said section of our constitution.

On the other hand, there existed at that time, and at all times since, the well established doctrine that a criminal judgment procured in one jurisdiction is not enforceable in a foreign jurisdiction; or, in other words, a criminal judgment procured in one jurisdiction does not have any extraterritorial effect. Such are the holdings of all the reported cases where the courts had passed upon the matter, except a few early cases appear to the contrary. These latter cases were based upon the erroneous assumption that penalties of a criminal character, procured in the jurisdiction of one state, could be enforced in the jurisdiction of another state, under the provisions of Article 4 of the Constitution of the United States, which provides: "Full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state. And the congress may by general laws prescribe the manner in which such acts, records, and proceedings shall be proved, and the effect thereof."

The Supreme Court of the United States, however, clarified this situation in the early case of Wisconsin v. Pelican Ins. Co. 127 U. S. 265, 32 L. ed. 239, 8 S. Ct. 1370, decided May 14, 1888, and had occasion to comment on the cases holding to the contrary in the following language: "The only cases cited in the learned argument for the plaintiff . . . are Spencer v. Brockway, 1 Ohio, 259, 13 Am. Dec. 615, . . . Healy v. Root, 11 Pick. 389, . . . and Indiana ex rel. Stone v. Helmer, 21 Iowa, 370, . . . based upon the supposed effect of the provisions of the constitution and the act of congress as to the faith and credit due to a judgment rendered in another State, which had not then received a full exposition from this court; and the other reasons assigned are not such as to induce us to accept those decisions as satisfactory precedents to guide our judgment in the present case."

The general rule for the construction of a constitution or a statute, with reference to disqualification, has been uniformly laid down by the text writers on the subject. Thus, in 29 Cyc. 1385, the rule is presented as follows: "The constitution or a statute frequently disqualifies for office one who has been convicted of a felony or a crime generally. Where the constitution contains such a provision it applies to crimes committed under the jurisdiction of the state providing the disqualification and not to crimes against another government."

In 46 C. J. page 949, § 60, the text presents the rule thus: "Constitutions or statutes frequently disqualify for office one who has been convicted of a felony or a crime generally. Whether or not a crime is within the meaning of such a provision is a question for the courts. Ordinarily conviction in the courts of the United States of an offense created by an act of Congress does not constitute a disqualification, but the legislature, under authority of the constitution, may declare that such a crime either against the laws of the state, United States, or a sister state shall operate as a disqualification."

This general rule is sustained by the overwhelming weight of authority, as indicated by many decisions of both state and federal courts. One of the earliest, and a leading case on the subject, is Com. v. Green, 17 Mass. 515, decided March, 1822. The question arose whether the witness Stoddard, who had testified in the case, was incompetent as a witness by reason of the fact that he had been convicted of larceny in the courts of New York. The laws of New York provided that any one

convicted of a felony was rendered infamous and incompetent to testify in its courts. The question arose whether such disqualification followed him beyond the jurisdiction of New York. The Massachusetts court held that it did not, and that he was competent to testify. Chief Justice Parker delivered the opinion, and analyzed and discussed at length the fundamental principles underlying the effect of a conviction in a jurisdiction foreign to the state, as bearing upon whether a disqualification existed. The court said, in part:

". . . But it is manifest that a judgment on a criminal prosecution cannot be carried into effect, beyond the jurisdiction of the state, within which the offense was committed; or, if this might be done by virtue of any act of congress, founded upon such a construction of the constitutional provision, it is clear that such power has never been challenged; and it is hardly possible to conceive that such a construction will ever be adopted, so long as any portion of sovereignty remains with the states. For the right and duty of punishing offenses must necessarily be limited to the authorities, against which the offenses have been committed. Indeed the provision in the second section of the fourth article of the constitution of the United States is wholly inconsistent with the supposition of such a power. . . .

"I think this proves satisfactorily that the clause in the Constitution of the United States, relating to the faith and credit to be given to judgments, has no effect whatever on judgments upon criminal suits; and that, in this respect, the relation of the states to each other is left wholly unaffected by the Constitution."

In the case of Sims v. Sims, 75 N. Y. 466, an objection was raised as to the competency of a witness to testify who had been convicted of crime in the state of Ohio. The court followed the rule laid down in the case of Com. v. Green, supra, and held that the witness was competent to testify. The court said, in part:

"The case last referred to (Com. v. Green) rests upon the ground that the disqualification is in the nature of an additional penalty, following and resulting from the conviction, and cannot extend beyond the territorial limits of the state where the judgment was pronounced. . . . I think this doctrine applicable to the question now in hand and that there is nothing in the Constitution of the United States which prevents such application, or requires that the personal dis-

abilities, such as incompetence to testify, or to vote, which may be imposed upon a person convicted of crime in one state, should follow him and be enforced in all the others. If such were the operation of the constitutional provision the qualifications of witnesses called in our courts and of voters at our elections might be made to depend upon the laws of other states instead of our own."

To the same effect is National Trust Co. v. Gleason, 77 N. Y. 400, 33 Am. Rep. 632.

In the case of Logan v. United States, 144 U. S. 263, 36 L. ed. 429, 12 S. Ct. 617, a question arose as to the competency of two witnesses offered on behalf of the government. Objection was made to their competency to testify, upon the grounds that each had been convicted of felony in another jurisdiction. The Supreme Court of the United States, in passing upon the matter, held, that they were competent to testify, and followed the rule laid down in Com. v. Green, 17 Mass. 515, supra, which is cited in the opinion. Justice Gray, speaking for the court, said, in part:

"At common law, and on general principles of jurisprudence, when not controlled by *express statute* giving effect within the State which enacts it to a conviction and sentence in another State, such conviction and sentence can have no effect, by way of penalty, or of *personal disability* or *disqualification,* beyond the limits of the State in which the judgment is rendered. Wisconsin v. Pelican Ins. Co. 127 U. S. 265, 32 L. ed. 239, 8 S. Ct. 1370; Com. v. Green, 17 Mass. 515; Sims v. Sims, 75 N. Y. 466; National Trust Co. v. Gleason, 77 N. Y. 400, 33 Am. Rep. 632; Story, Confl. Laws, § 92; 1 Greenl. Ev. § 376." (Italics ours.)

The rule of law, so clearly and succinctly presented in the latter case, has been cited and followed by many courts.

The terms "penalty," or "personal disability," or "disqualification," referred to in the Logan Case and the other cases cited, contemplate, not only punishments by way of imprisonments and fines imposed, or disqualification to testify as witnesses, but embrace all other personal disabilities or disqualifications, including the right to vote and the right to hold political or other civil office, as several of the cases disclose that are hereinafter cited and discussed.

It is significant, also, that we have no "express statute" giving effect

to a "conviction and sentence in another state" or in another jurisdiction; nor does said § 127 of the Constitution contain any "express" provision to that effect. No exceptions to the rule hereinbefore set forth by the text writers and the decisions cited, existing in either our constitution or our statutes, the general rule must certainly apply in the instant case; and so applying such rule, I am unable to arrive at the conclusion, as my associates have, that a disqualification exists in the instant case with reference to the respondent, the Governor.

In the case of Hildreth v. Heath, 1 Ill. App. 82, involving the competency of the defendant to hold public office, the court held that conviction of a crime as a disqualification was confined to those offenses committed against the laws of Illinois only; and that a conviction in the federal court sitting in that state, did not operate to disqualify or render him ineligible.

In Queenan v. Territory, 11 Okla. 261, 71 P. 218, 61 L.R.A. 324, involving the competency of a juror to sit in the trial of a case, the same principle of law was involved. The court cited and quoted approvingly from Logan v. United States, 144 U. S. 263, 36 L. ed. 429, 12 S. Ct. 617, supra, and decided the case in accordance with the rule of law set forth in the Logan Case.

In the case of Garitee v. Bond, 102 Md. 379, 62 A. 631, 111 Am. St. Rep. 385, 5 Ann. Cas. 915, involving the competency of an executor under the laws of Maryland, who had been convicted of a felony in the district court of the United States for the district of Maryland, the court, upon the authority of Logan v. United States, supra, and cases cited therein, determined that the jurisdiction of the United States district court "must be considered quoad hoc as foreign to that of the Maryland courts."

The penal code of New York provides that a sentence, in addition to the regular sentence, may be imposed if the defendant has been previously convicted of a crime punishable by imprisonment in a state prison. In People v. Gutterson, 244 N. Y. 243, 155 N. E. 113, decided December 31, 1926, the defendant Gutterson had been convicted and sentenced previously on a felony charge in another jurisdiction. The court held that the lower court erred in imposing an additional sentence, and cited as a precedent for so holding the early New York case of Sims v. Sims, 75 N. Y. 466, supra, and cited, also, among

other authorities, the case of Logan v. United States, 144 U. S. 263, 36 L. ed. 429, 12 S. Ct. 617, supra. The syllabus in the case sets forth the rule of law in the exact language of the Logan Case.

In the case of Re Ebbs, 150 N. C. 44, 63 S. E. 190, 19 L.R.A.(N.S.) 892, 17 Ann. Cas. 592 (decided December 22, 1908), the court quoted approvingly from Judge Parker's opinion in the case of Com. v. Green, 17 Mass. 515, supra, wherein it is said: "What is felony also in one country may not be felony in another, and it is competent for the legislature of every nation to attach disabilities to the commission of offenses which by the laws of other nations may be wholly without such consequences." The North Carolina court, commenting further, said:

"We know that the federal government punishes practically all offenses with imprisonment in the penitentiary. Violations of the revenue laws, often technical and involving no moral turpitude whatever, may be so punished. Again, acts which in our state are deemed misdemeanors, punishable by fine or a short term in the county jail or house of correction, are deemed of grave character and punished by imprisonment in the state's prison in other states. Each state makes its penal codes, and the federal government does the same. If any other interpretation were put upon our statute, it would logically follow that, for violation of the federal statutes or statutes of other states, citizens of this state would forfeit their right to vote under our Constitution. Certainly the people of North Carolina never contemplated that any such construction would be put upon their laws."

In the recent case of State ex rel. Mitchell v. McDonald, 164 Miss. 405, 145 So. 508, 86 A.L.R. 290 (decided January 9, 1933), a petition filed by the state of Mississippi, on the relation of its attorney general, charged that the appellee, Dr. McDonald, unlawfully and without any warrant or right whatever, was holding and exercising the duties of the office of supervisor of district No. 3, Lauderdale county, for the reason, it is alleged, that he was disqualified to hold such office in that he had been convicted of felony in the United States district court for the eastern district of Louisiana before his election to said office. The Supreme Court of Mississippi determined that a disqualification did not exist by reason of such conviction. The court held: "The question as applied to the disability of a person to testify has arisen in many cases, and the reasoning and principles applied in

those cases apply with equal force to a disqualification for holding office arising out of a conviction of crime, and lead to the conclusion that only convictions of crimes committed under the jurisdiction of this state will disqualify one from holding office in this state." Among the authorities cited by the court as in point are Com. v. Green, 17 Mass. 515; Logan v. United States, 144 U. S. 263, 36 L. ed. 429, 12 S. Ct. 617, and Re Ebbs, 150 N. C. 44, 63 S. E. 190, 19 L.R.A.(N.S.) 892, 17 Ann. Cas. 592, supra.

Without discussing all of the cases bearing on the subject, the following authorities are cited as sustaining the principle of law announced in Com. v. Green, Logan v. United States, and the other authorities hereinbefore mentioned: Weber v. State, 18 Okla. Crim. Rep. 421, 195 P. 510; Goldstein v. State, 75 Tex. Crim. Rep. 390, 171 S. W. 709; State v. Landrum, 127 Mo. App. 653, 106 S. W. 1111; 1 Greenl. Ev. § 376; 1 Wigmore, Ev. (2d ed.) § 522; Story, Confl. Laws, §§ 91, 93, 104, 620 and 625; Gandy v. State, 10 Neb. 243, 4 N. W. 1019; Brown v. United States (C. C. A. 6th) 233 F. 353, L.R.A.1917A, 1133.

In the federal case of Brown v. United States (C. C. A. 6th) 233 F. 353, L.R.A.1917A, 1133, supra (decided May 12, 1916), it is indicated that the rule as laid down by the Supreme Court of the United States in Logan v. United States still obtains in the federal courts. In this case it was held that a conviction in a state court, of an infamous crime, does not render one incompetent as a witness in a federal court sitting in the same state. The court said, in part:

"The effect of the doctrine, summarized by professor Greenleaf, that it is nothing less than the judgment of conviction making infamy, which is effective to disqualify, part of the penalty, is such that, if we hold that a court of another sovereignty than that of the tribunal rendering the judgment, must also, ipso facto, regard the convict as disqualified, we are not simply applying a rule of decision, but are enforcing a penal judgment.

"Federal practice enforces the principle that a judgment of infamy has, at the best, no extraterritorial applicability."

In this case the court had occasion, also, to point out the separate and distinct character of the government of the United States in its relation to the states, and of the states to each other, with reference to

criminal judgments procured in the courts of such governments, respectively. In discussing the question, the court said:

". . . state and Federal courts, sitting in the same state, and having the same territorial jurisdiction, are foreign to each other in the sense that the courts of two states are foreign.

"The essential distinction between the government of the United States and that of any state, as two independent political identities, has been frequently pointed out in the decisions of the Supreme Court. Fox v. Ohio, 5 How. 432, 12 L. ed. 222; Moore v. Illinois, 14 How. 17, 14 L. ed. 307; Slaughter-House Cases, 16 Wall. 36, 21 L. ed. 394; United States v. Cruikshank, 92 U. S. 542, 23 L. ed. 588; Ex parte Siebold, 100 U. S. 371, 25 L. ed. 717. The last exposition of the subject is found in Twining v. New Jersey, 211 U. S. 78, 53 L. ed. 97, 29 S. Ct. 14. The rule arises most frequently, as in cases just cited, where there is an apparent conflict of law between a state and the Federal government touching crimes. The absolute separation of the two sovereignties, with independent jurisdictions unburdened with responsibilities one to the other, save as occasionally the paramount authority of the Federal power is called into operation, is certainly emphasized by the fact that, upon the same state of facts, a wrongdoer may be called upon to answer to both governments."

Quoting further from the opinion:

"Obviously the courts of one state in the Union are regarded as 'foreign' to the courts of another, not because of geographical separation, but because they are instrumentalities of independent sovereignties. A district court of the United States sitting in one state cannot be said to be geographically 'foreign' to the state courts of another state, for the reason that the sovereignty of which it is a part has geographical extension over the territory of the other state. It is limited, to be sure, to a territorial jurisdiction which may not include the situs of a state court, but it is nevertheless an integral part of a judicial system which extends over the situs of every state court. It is therefore 'foreign' to the court of a state beyond its territorial limitations only because its jurisdiction depends upon the question of sovereignty, and it obtains its authority from a sovereign distinct from and independent of that creating the state court. For that reason, for instance in the case cited above, a Federal and a state court of the same state are

free, each independent of the other, to punish as an offense against their respective sovereignties, the same act which serves as the predicate of a crime within the definition of the laws of the two sovereignties, . . ."

Said case of Brown v. United States makes clear that the jurisdictions of the United States district courts are foreign to the states in the same sense and to the same extent as the jurisdictions of the state courts are foreign to each other, and definitely independent and free in their acts, as indicated by the several decisions of the Supreme Court of the United States cited in the opinion in the Brown Case. A state government has no part in the procurement of a criminal judgment in the federal courts, or in the execution of such judgment. Conversely, the federal government has no part in the procurement of criminal judgments in the courts of the states, or in the execution of their judgments.

Article 6 of the Constitution of the United States and § 3 of the Constitution of North Dakota, both cited and quoted in the majority opinion, are not in conflict, in any manner, with the principles laid down in the Brown Case, or the asserted rule of law therein that, "Federal practice enforces the principle that a judgment of infamy has, at the best, no extraterritorial applicability."

In view of the absolutely independent character of a criminal judgment procured in a jurisdiction foreign to this state, it is difficult to conceive that the framers of our state Constitution intended an automatic disfranchisement and deposition of an incumbent of the high office of governor, upon a mere conviction of a felony in such jurisdiction and before a final determination of the same on appeal, and even though the act complained of may not involve any moral turpitude whatever.

Such is the plain implication of the majority opinion, as I read it, wherein it says: "We therefore hold that consistent with the theory and purpose of § 127, whether an offense for which a conviction is had is a felony must be determined by the law of the jurisdiction where it is committed."

. Such construction, it seems to me, would lead us into strange paths and byways. As indicated hereinbefore, what may be a felony in one state or in one jurisdiction may not be a felony in another, or even

a crime whatever. Thus, in North Dakota, to carry on one's person, or in one's personal possessions, a pistol or small firearm beyond his dwelling or place of business, is a felony with a minimum punishment of at least one year's imprisonment and no maximum amount fixed in the law. 1925 Supplement to the Comp. Laws 1913, § 9803a6.

In the state of Texas—and in some of the other states—a citizen while traveling is privileged to carry a small firearm on his person or in his personal possessions. Penal Code, Tex. Stat. 1928, art. 484. If the governor of Texas on a visit to North Dakota should have on his person or in his baggage a small firearm, in accordance with lawful custom in the state of Texas, and enter the state of North Dakota with the same in his possession, he would be guilty of a felony under our laws, although he acted in ignorance of the law—and moral turpitude in fact was not involved.

Assuming the Constitution of Texas to be the same as that of North Dakota, and assuming the same construction placed thereon as in the majority opinion in this case, upon conviction, the governor of Texas, ipso facto, would be disqualified to longer perform the duties of his office even though he was never imprisoned or incapacitated otherwise to perform the duties of the office. The state of Texas would have no control over the judgment of conviction in North Dakota, or right to pardon or restore civil rights thereunder, as such authority would rest with the pardoning power of the state in which the judgment was procured. The governorship of Texas, therefore, in such circumstances, would be at the sufferance of the powers of another state.

As stated in Re Ebbs, 150 N. C. 44, 63 S. E. 190, 19 L.R.A. (N.S.) 892, 17 Ann. Cas. 592, supra, practically all offenses against the United States government are classed as felonies; and, again quoting from the decision, "the federal government punishes practically all offenses with imprisonment in the penitentiary. Violations of the revenue laws, often technical and involving no moral turpitude whatever, may be so punished."

Let us assume that a governor of this state, being required to do so, fails to comply with the federal revenue laws, by reason of press of business he neglected the matter, or because of other inadvertence, and that the penalties in such failure constitute a felony. In such circumstances, upon conviction, he would be disqualified to longer perform his

duties as governor, in the light of the majority opinion in the instant case, and even though no imprisonment took place and no moral turpitude whatever was involved.

In the instant case the respondent, the Governor, was convicted of conspiracy in the United States District Court, sitting in the District of North Dakota, the particular acts complained of being, that certain parties, with the knowledge and prearrangement of the respondent, had solicited from federal employees subscriptions to a newspaper in which the Governor was interested, to the extent of $179.50. This the government contended is contrary to the provisions of certain federal statutes.

The conspiracy statute under which the respondent was convicted is § 5440, as amended, § 88 (Criminal Code, § 37), USCA, title 18. This statute reads: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."

The offense defined by said § 5440 was originally a misdemeanor. Berkowitz v. United States (C. C. A. 3d) 93 F. 452. By the Act of March 4, 1909, chapter 321, § 335 (USCA, title 18, § 541), all offenses punishable by imprisonment exceeding one year are deemed felonies. At common law a conspiracy whether for the commission of a misdemeanor or a felony, is a misdemeanor, only. 12 C. J. 581, § 97. Under the laws of North Dakota criminal conspiracies are misdemeanors only. Comp. Laws 1913, § 9441.

The majority opinion cites as authorities for the construction placed upon § 127 of the Constitution and the resulting disqualification of the Governor, certain cases, eighteen in number, which I shall analyze and discuss at this time, and which I believe can have but little, if any, weight as authorities with reference to the questions involved in the instant case. The cases referred to and cited in the opinion are as follows: Cowan v. Prowse, 93 Ky. 156, 19 S. W. 407; State v. Candler, 10 N. C. (3 Hawks) 393; Chase v. Blodgett, 10 N. H. 22; State v. Foley, 15 Nev. 64, 37 Am. Rep. 458; Seitz v. Ohio State Medical Bd. 24 Ohio App. 154, 157 N. E. 304; Re Hodgskin, 193 App. Div. 217, 183 N. Y. S. 401; Re Lindheim, 195 App. Div. 827, 187 N. Y. S. 211;

Barnes v. District Ct. 178 Cal. 500, 173 P. 1100; Re O'Connell, 184 Cal. 584, 194 P. 1010; Re Kerl, 32 Idaho, 737, 188 P. 40, 8 A.L.R. 1259; Re Peters, 73 Mont. 284, 235 P. 772; Re Elliott, 122 Okla. 180, 253 P. 103; Re Kirby, 10 S. D. 322, 414, 73 N. W. 92, 907, 39 L.R.A. 856, 859; Re Finch, 156 Wash. 609, 287 P. 677; Re Comyns, 132 Wash. 391, 232 P. 269; Re Minner, 133 Kan. 789, 3 P. (2d) 473, 79 A.L.R. 35; State ex rel. Anderson v. Fousek, 91 Mont. 448, 8 P. (2d) 791, 84 A.L.R. 303; State ex rel. Beckman v. Bowman, 38 Ohio App. 237, 175 N. E. 891.

With reference to the Kentucky case of Cowan v. Prowse, cited, the question arose as to whether a certain witness was entitled to vote at an election, he having been convicted of felony in a United States court and later pardoned by the President. It was held that he was entitled to vote. The effect of the conviction in the United States court is briefly mentioned, to the effect that the conviction would disqualify him the same as if convicted in the courts of the same state. The case is somewhat involved, and a number of points were determined, but the whole treatment of the subject, with reference to the effect of said conviction, is contained in a very brief statement and constitutes only a part of a single paragraph in the opinion. No authorities are cited. The pertinent legal question determined by this case, in connection with this matter, was that a pardon restored all civil and political rights. The date of this decision is just thirty-one days after the Supreme Court of the United States had decided the case of Logan v. United States, 144 U. S. 263, 36 L. ed. 429, 12 S. Ct. 617, supra, and it is quite probable that the opinion in the latter case was not before the Kentucky court at the time the Cowan Case was determined. It seems to me that no weight as an authority on the question involved in the case at bar, can be attached to this decision.

The cases of State v. Candler, 10 N. C. (3 Hawks) 393, and Chase v. Blodgett, 10 N. H. 22, also cited, were both strongly disapproved in the subsequent New York case of Sims v. Sims, 75 N. Y. 466, supra. Moreover, the said North Carolina case mentioned, State v. Candler, was disapproved by the same court, the Supreme Court of North Carolina, in the more recent case of State v. Ebbs hereinbefore cited and discussed, which court had occasion to refer to the Candler Case in the following language: "The question, as applied to the disability of a

person offered as a witness to testify, arose in this state in State v. Candler, 10 N. C. (3 Hawks) 393, when it was held by a divided court that a witness convicted of an infamous crime in Tennessee was incompetent to testify in this state. . . . The question has been decided otherwise in many other states, and the decided weight of authority is against the decision in Candler's Case." The court determined the case upon the rule laid down in Com. v. Green, 17 Mass. 515, Sims v. Sims, 75 N. Y. 466, and Logan v. United States, 144 U. S. 263, 36 L. ed. 429, 12 S. Ct. 617, supra, as hereinbefore indicated.

I desire to note in passing, that the North Carolina case of State v. Jones, 82 N. C. 685, quoted in the majority opinion, to the effect that "the disqualification for office and the loss of the right of suffrage imposed by article 6 of the Constitution, upon persons convicted of infamous offenses, constitute no part of the judgment of the court, but are mere consequences of such judgment," has reference to criminal judgments procured in the courts of North Carolina only, and not to judgments in another jurisdiction. This I believe to be a fair statement of the law, as the same court in the subsequent North Carolina case of Re Ebbs, 150 N. C. 44, 63 S. E. 190, 19 L.R.A.(N.S.) 892, 17 Ann. Cas. 592, supra, in denying that a judgment of conviction had extraterritorial effect, said:

"If any other interpretation were put upon our statute, it would logically follow that, for violation of the federal statutes or statutes of other states, citizens of this state would forfeit their right to vote under our constitution. Certainly the people of North Carolina never contemplated that any such construction would be put upon their laws."

The Nevada case of State v. Foley, 15 Nev. 64, 37 Am. Rep. 458, cited, concerns the qualifications of a witness to testify in the courts of Nevada, the witness having been previously convicted of crime in another state.. The court held the witness was disqualified. This case is unique, as the determination therein is opposed to the rule laid down in the long line of state and federal cases holding to the contrary, as hereinbefore cited. The court stresses the early North Carolina case of State v. Candler, 10 N. C. (3 Hawks) 393, supra, as authority. However, North Carolina disapproved the Candler Case in Re Ebbs, supra, as hereinbefore indicated.

The said cases of State v. Candler and Chase v. Blodgett had both

been decided long prior to a determination of the same question in the Logan Case; and the said case of State v. Foley had been determined more than ten years before the Supreme Court of the United States spoke in the Logan Case. Whether or not the court in State v. Foley had some doubt as to the wisdom of the rule to which it adhered, or whether any significance can be attached thereto, nevertheless the court used the following language: "It may be that the tendency of enlightened opinion and of recent legislation in other states and countries is against the rule . . .; it may be that it is an unwise and impolitic rule, but it is unquestionably the law of this state."

The case of Seitz v. Ohio State Medical Bd. 24 Ohio App. 154, 157 N. E. 304, cited, involves the right or authority of the Medical Board of the state of Ohio to revoke a doctor's license to practice medicine, he having been convicted in a federal court of offenses in violation of the narcotics law; and eleven of the remaining thirteen cases cited involve the disbarment of attorneys at law.

An analysis of these disbarment cases cited in the majority opinion discloses that they can hardly be considered as authorities for the precise question involved in the instant case. These disbarment cases are in the nature of disciplinary measures. An attorney at law is an officer of the court, officially created by the court, and the courts generally claim the inherent power to discipline or disbar attorneys for conduct or crimes wherever committed, whether in the same state, or in another state, or even in a foreign country.

What has been said with reference to the office of attorney at law applies with equal force to the revocation of licenses of medical doctors. Medical boards, under the police powers, have the broadest authority in the licensing of members of the profession, and in the revocation of such licenses on account of crimes or misconduct; and with few exceptions the courts will not review their determinations. Meffert v. State Bd. of Medical Registration (Meffert v. Packer) 66 Kan. 710, 72 P. 247, 1 L.R.A.(N.S.) 811, affirmed in 195 U. S. 625, 49 L. ed. 350, 25 S. Ct. 790; Richardson v. Simpson, 88 Kan. 684, 129 P. 1128, 43 L.R.A.(N.S.) 911; State ex rel. Williams v. Purl, 228 Mo. 1, 128 S. W. 196; Lawrence v. Board of Registration in Medicine, 239 Mass. 424, 132 N. E. 174; 48 C. J. p. 1098, § 68.

The powers of the courts with reference to the regulation, discipline

and disbarment of attorneys, and the rules of construction with reference to constitutional provisions or statutes concerning the same, are clearly set forth in 2 R. C. L. p. 1086, § 179. The text reads:

"In the absence of constitutional or statutory restrictions, a court of superior or general jurisdiction has authority to suspend an attorney from practice as such, or to disbar or strike from the rolls an attorney of such court upon proper grounds, because attorneys are officers of the court in which they are admitted to practice. The court, by reason of the *necessary and inherent power vested in it* to control the conduct of its own affairs, and to maintain its own dignity, has a summary jurisdiction to deal with the alleged misconduct of an attorney. . . ." (Italics ours.)

Such inherent power exists even without express constitutional provision or statutory enactment; and since this power is inherent in the courts, any constitutional or statutory restriction on this power must specifically and clearly appear. In other words, the courts have the power within themselves to regulate, discipline or disbar attorneys for misconduct regardless of where the misconduct occurs, whether in the state, in another state, or in a foreign country, unless constitutional or statutory provisions limit their scope. It is plain, then, that a different rule of construction applies, concerning such matters, than applies to constitutional or statutory provisions with reference to disqualification or infamy of voters. No court claims the inherent power to disqualify a voter or a governor, but constitutional or statutory authorization must exist, and therefore the rule of construction would be the opposite of the rule of construction with reference to the powers and duties of the courts pertaining to disbarment of attorneys. The rule of construction, on the one hand, concerns a limitation of power; and the rule, on the other hand, concerns a grant of power.

I believe that a careful reading of these disbarment cases will disclose this distinction in principle, and that there is no conflict in any of these cases with the rule of construction as laid down in Com. v. Green, 17 Mass. 515, and Logan v. United States, 144 U. S. 263, 36 L. ed. 429, 12 S. Ct. 617, supra, and the long line of decisions of both federal and state courts sustaining such rule.

The Montana case of State ex rel. Anderson v. Fousek, 91 Mont. 448, 8 P. (2d) 791, 84 A.L.R. 303, cited in the above list of cases from the

majority opinion, places considerable stress upon the South Dakota case of Re Kirby, 10 S. D. 322, 414, 73 N. W. 92, 907, 39 L.R.A. 856, 859, also a disbarment case. It is interesting to note, however, that the courts of South Dakota, like almost all of the other states, including North Dakota, claim such inherent powers as existing in the courts with reference to disbarment of attorneys. Re Egan, 22 S. D. 355, 117 N. W. 874; Danforth v. Egan, 23 S. D. 43, 47, 119 N. W. 1021, 1023, 139 Am. St. Rep. 1030, 20 Ann. Cas. 418.

In the case of Re Egan, supra, the Supreme Court of South Dakota said: "The court's control over an attorney as an officer of the court is inherent, and does not depend upon statutory authority."

In the case of Danforth v. Egan, supra, the Supreme Court of South Dakota had occasion to again speak concerning the inherent power of the court with reference to regulation and disbarment of attorneys, in the following language: "This right of the courts is as much the law of our land, and of as much dignity as such, as any law found in the Constitution or statutes. It is not dependent upon either the Constitution or statutes for its existence, but exists fully in all courts of record unless expressly restricted or taken away by express legislation. . . ." See also Re Simpson, 9 N. D. 379, 83 N. W. 541; Re Robinson, 48 Wash. 153, 92 P. 929, 15 L.R.A.(N.S.) 525, 15 Ann. Cas. 415; 6 C. J. p. 580, § 37.

Evidently, the high court of New York did not consider any of these disbarment cases, either as authorities or as precedents, in construing a statute involving a similar question to the one at bar. In two of the said New York disbarment cases cited in the majority opinion, Re Hodgskin, 193 App. Div. 217, 183 N. Y. S. 401, decided in 1920, and Re Lindheim, 195 App. Div. 827, 187 N. Y. S. 211, decided in 1921, the respondent in each case had been convicted of felony in the United States District Court, sitting in the state of New York, and each was disbarred summarily upon proof of the judgment of conviction only. The subsequent New York case of People v. Gutterson, 244 N. Y. 243, 155 N. E. 113, supra, decided December 31, 1926, and hereinbefore cited and discussed, despite the said disbarment cases, and apparently in total disregard thereof, quite consistently adhered to the rule laid down in the early New York case of Sims v. Sims, 75 N. Y. 466, and the federal case of Logan v. United States, 144 U. S. 263, 36 L. ed.

429, 12 S. Ct. 617; the Gutterson Case holding, "In absence of express statute, conviction or sentence under the laws of another state, government, or country can have no effect by way of penalty or of personal disability or disqualification, beyond the limits of the state in which the judgment is rendered." This quotation from the holding of the court is in the exact language used by the Supreme Court of the United States in the case of Logan v. United States cited in the case. The opinion is concurred in by Judge Cardozo, now a member of the Supreme Court of the United States.

Of the two remaining cases cited in the above list of cases from the majority opinion, the Montana case of State ex rel. Anderson v. Fousek, 91 Mont. 448, 8 P. (2d) 791, 84 A.L.R. 303, supra, likewise occupies a unique position with reference to the rule of law which it proclaims. The authorities relied on in that case, with one exception, are disciplinary and disbarment cases of attorneys at law, and a case involving the revocation of license of a medical doctor. This case is opposed to the long line of decisions cited herein to the contrary, of both state and federal courts, including the Supreme Court of the United States, and contrary to the rule laid down by the law writers in the text books and encyclopedias on the subject. Since the authority for the decision is apparently based largely upon disbarment and doctors' cases, and which are not analogous in principle to the case at bar, I do not believe this case can have any weight in determining the matter before us.

The only case relied on as authority in the said case of Anderson v. Fousek, other than those involving disbarment of lawyers, and a single case involving the revocation of a license of a medical doctor, is the Ohio case of State ex rel. Beckman v. Bowman, 38 Ohio App. 237, 175 N. E. 891, which is also cited and relied upon in the majority opinion together with the said case of State ex rel. Anderson v. Fousek, as the two cases which, it is claimed, are directly in point in this case.

The State ex rel. Beckman v. Bowman Case involved a mandamus proceeding, prosecuted by Bowman, to compel the Trustees of the Police Relief Fund of the police department of the city of Cincinnati to grant relator's application for a pension. The trustees had refused his application, apparently upon the ground that relator had plead guilty to a felony charge concerning intoxicating liquors, in the United States District Court, and was sentenced to three months in jail and that,

therefore, he could not qualify for the pension. Section 4616, General Code of Ohio, states that where a city has an organized police department, the city council may by ordinance provide for a police relief fund, to be administered by a board of trustees. The trustees are selected by the members of the police force, and the fund is created, partly by taxation and partly by donations. Section 4628 of the same code reads: "Such trustees shall make all rules and regulations for distribution of the fund, including the qualifications of those to whom any portion of the fund shall be paid, and the amount thereof. . . ."

Section 45 of the rules and regulations promulgated by the trustees provides: "Any member of the Police Department who has served fifteen consecutive years, who is discharged for any offense other than dishonesty, cowardice, or being convicted of felony, shall, upon the approval of the Board of Trustees of the Police Relief Fund, be paid a pension from said fund. . . ." The trustees had denied the application and had evidently ruled that a conviction of felony in another jurisdiction would disqualify, and the Supreme Court sustained this ruling in denying the writ.

The scope and power of the trustees under the said law for creating and administering the fund, came into question in the case of State ex rel. Little v. Selby, 22 Ohio L. Rep. 410, which is also a mandamus proceeding, to compel the trustees to allow a certain petition praying for participation in the fund. The petition had been denied and the Supreme Court of Ohio, in commenting upon the powers of the trustees and particularly their judicial powers in the administration of the fund, said, in part: "In the case a bar, there is no statute specifically enjoining upon the trustees the duty to grant a pension upon any specified state of facts; on the contrary, the statute specifically invests the trustees with authority to distribute a gratuity, to make rules therefor, and to some extent at least, to interpret such rules and apply the same in accordance with facts to be found by them, and as to all of which they are to exercise some degree of discretion and judgment."

The court also said: "The rule as stated by the Supreme Court of the United States is that the court will not interfere by mandamus with the exercise of duties of boards of this character, 'even where those duties require an interpretation of the law, the court having no appellate power for that purpose; but when they refuse to act at all, or when by special

statute, or otherwise, a mere ministerial duty is imposed on them—that is, a service which they are bound to perform without further question —then, if they refuse, a mandamus may be issued to compel them.' United States ex rel. Dunlap v. Black, 128 U. S. 40, 32 L. ed. 354, 9 S. Ct. 12.

"In the above case the officer whose act was sought to be reviewed interpreted the law adversely to the relator and the Supreme Court said, 'Whether, if the law were properly before us for consideration, we should be of the same opinion or of a different opinion, is of no consequence in the decision of this case.' . . .

"As a general rule, where the duty is such as necessarily requires the examination and consideration of evidence and the decision of questions of law or fact, such a duty is not ministerial, but involves the exercise of judgment and is therefore classed as a discretionary duty."

I have perhaps extended this presentation unduly, but in view of the important consideration of this case given in the majority opinion as an authority, it seems to me its force or lack of force as such cannot be fully comprehended without this background. Briefly, this police fund is administered by a board of trustees clothed with broad legislative and judicial powers. They make all the rules and regulations and they also have the power to interpret or construe those rules, and the courts will not interfere if they take action. If they refuse to act one way or the other, then the courts may interfere; and such are about the only instances wherein the courts pretend to be concerned.

While the reported case of State ex rel. Beckman v. Bowman, 38 Ohio App. 237, 175 N. E. 891, is quite brief, it is evident that the trustees had refused Bowman's petition for the reason that they had interpreted their own rules to preclude one convicted of felony in another jurisdiction from participation in the fund. They had the authority to make such rule, and to so interpret it, and the Supreme Court of Ohio refused to grant the writ of mandamus. This case is analogous in principle to the said case of State ex rel. Little v. Selby, 22 Ohio L. Rep. 410, supra.

But this interpretation or construction of a local rule fixed by the Trustees of the Police Fund of Cincinnati, with almost plenary powers in its administration and interpretation, can have no bearing or shed

any light upon interpreting or construing § 127 of the Constitution of North Dakota.

But there is another reason, equally potent, why the framers of our state constitution, and the people who adopted it, never intended that an incumbent of the high office of governor should be automatically deposed by reason of a mere conviction and sentence in a jurisdiction foreign to the state, as the makers of the instrument provided for every contingency, and in keeping with the definite plan of self-government which the constitution establishes.

Thus § 196 of the Constitution of North Dakota provides: "The governor and other state and judicial officers, except county judges, justices of the peace and police magistrates, shall be liable to impeachment for habitual drunkenness, crimes, corrupt conduct, or malfeasance or misdemeanor in office."

Section 194 of the Constitution states that the house of representatives shall have the sole power of impeachment, and § 195 provides that such impeachment shall be tried by the Senate. Section 198 asserts that no officer shall exercise the duties of his office after he is impeached and before he is acquitted of the charge; and § 200 of the Constitution provides that the officer may be tried for the offenses charged at any time after the expiration of twenty days from the date that a copy of the impeachment charges is served upon him.

The offenses for which the house of representatives may impeach a constitutional officer such as governor, are not confined to crimes or corrupt conduct committed within the state of North Dakota but include all such crimes or corrupt conduct committed in other states, or against the United States, or committed in any other country, or upon the high seas. The constitution wisely contemplates that those acts where moral turpitude is involved, wherever committed, come within the authority of the legislature to investigate, try and determine, and, if warranted, to remove from office temporarily or permanently. State ex rel. Shartel v. Brunk, 326 Mo. 1181, 34 S. W. (2d) 94; State ex rel. Trapp v. Chambers, 96 Okla. 78, 220 P. 890, 30 A.L.R. 1144; Ferguson v. Maddox, 114 Tex. 85, 263 S. W. 888.

A governor, like any other individual, must meet the consequences and pay the penalties for such crimes as he commits; but, like any other individual, he is entitled to his day in court—his full day in court—

and he has not had his full day in court where an appeal is taken and the matter is not finally determined on the appeal. Whether, upon conviction and pending an appeal to the higher court, a governor should lay aside the duties of his office, either temporarily or permanently, depends, not upon what name may be given to the particular offense charged, but upon the nature and character of the alleged act and the degree of moral turpitude involved.

If § 127 of our constitution contemplates, that in case a constitutional officer of this state is convicted of an offense in Minnesota, denominated by the latter state as a felony, and, ipso facto, the officer is thereby disqualified to perform his duties further; or, if he should be convicted in Illinois of the same character of act, which by the latter state is denominated a misdemeanor only, and consequently no disqualification to hold the office results therefrom; then, whether or not he shall continue in the performance of his official duties, on the one hand, or be deposed, on the other hand, is dependent merely upon nomenclature, or the choosing of names, rather than upon the science of criminal punishments, which is naturally and logically based upon the degree of moral turpitude involved.

Nor is impeachment dependent upon what may be the outcome of a prosecution in a foreign jurisdiction. On conviction in another jurisdiction, an appeal may be taken or a new trial granted, either by the trial court or the appellate court, and the delay occasioned thereby may extend over a period of several months, or a year or more; or, an acquittal of the charge may result in the courts. But this would not affect the power and authority of the legislature, the house of representatives to impeach, and the senate to try the charges.

Thus, the constitution provides a complete and expeditious system for investigation by the legislature of charges against a constitutional officer, including governor, with power to remove temporarily or permanently, and in a consistent and orderly manner, fully contemplating, however, such safeguards as may be essential to prevent undue or untoward designs or encroachments upon such office, or upon such department of the government. It is one thing to disqualify a voter; but it is a matter of quite different import to depose a governor engaged in the performance of his duties.

The removal of a governor is not a trivial matter but is fraught with

deep responsibilities and grave consequences. His office is that of sovereign executive power, and its position in the state is comparable with the office of president in its relation to the United States. The office of governor is a heritage of colonial times, and its historical background has firmly established its significance and importance. In fact, the authors of our federal constitution fashioned the office of president after the office of governor, as it was known and had existed prior thereto for considerably more than a century.

In the performance of his duties a governor not only executes the laws of the state, but he recommends to the legislature and to the people such policies and measures as he deems wise and expedient. His hand is on every legislative enactment, in approval or in disapproval. He occupies a unique position of leadership. He is the one individual of all the inhabitants of the state whom the people have chosen for such responsibility and trust.

In construing a provision of our constitution affecting the tenure of a constitutional officer, such as governor, the subject must be viewed in its broadest aspects, and the particular case under consideration must be regarded as but one of several, perhaps many, instances contemplated by the provision. If, in considering the practical operation of such provision of law, striking inconsistencies would result, highly antagonistic to the thought of self-government,—the very purpose for which the constitution was formulated and adopted,—then we may well seriously doubt that the framers of the constitution intended such construction; and this view would certainly be fortified where the constitution itself provides a remedy consistent with and expedient for any and all emergencies.

In construing certain provisions of the Constitution of Colorado, the Supreme Court of the United States said, "The simplest and most obvious interpretation of a constitution, if in itself sensible, is the most likely to be that meant by the people in its adoption." Lake County v. Rollins, 130 U. S. 662, 32 L. ed. 1060, 9 S. Ct. 651.

In viewing the situation as it exists in this case, therefore, it is apparent that the construction placed upon § 127 of the Constitution, by the majority opinion, is contrary to the rule of construction as laid down by the long line of decisions of both state and federal courts, including the Supreme Court of the United States, and which cases are directly

in point; it is contrary to the view of such eminent authorities as Corpus Juris, Cyc., Wigmore, Ev. Greenl. Ev. and Story, Confl. Laws. That no authorities of a substantial or persuasive character, which are in point or analogous in principle, exist to the contrary, it seems to me, is borne out by a careful consideration of all of the cases touching on the subject; and that the Montana case of State ex rel. Anderson v. Fousek, 91 Mont. 448, 8 P. (2d) 791, 84 A.L.R. 303, stands practically alone in the rule which it proclaims.

Moreover, to establish a system of automatic deposition of a constitutional officer, such as governor, by powers wholly beyond the jurisdiction of the state, and without any element of control by the authority of the state, and without regard to the degree of moral turpitude involved, is an innovation in government contrary to the generally accepted ideas of self-government, and not in keeping with the intention of the men who framed the constitution or of the people who adopted it. From my knowledge of the men who wrote the constitution of this state, and the rugged independence of those pioneers, the people who adopted it as the fundamental law of this state, I do not believe that they ever intended such construction to be given to that instrument.

The petition in this case and the stipulated facts do not indicate any cause of action and the writ should be denied.